Mary Ann McWILLIAMS (Clark), Plaintiff-Appellant and Respondent,

v.

Malcolm Lloyd WRIGHT, Defendant-Appellant,

and

Ralph M. Mack, Defendant-Respondent.

No. 54422.

Supreme Court of Missouri, Division No. 2.

Nov. 9, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 14, 1970.

W. H. Utz, Jr., St. Joseph, Daniel, Clampett, Ellis, Rittershouse & Dalton, W. Ray Daniel, B. H. Clampett, Springfield, for plaintiff-respondent, Mary Ann Mc-Williams (Clark).

Woolsey, Fisher, Clark & Whiteaker, Raymond E. Whiteaker, Springfield, for defendant-appellant, Malcolm Lloyd Wright.

Meredith B. Turner, Kenneth H. Reid, Turner, Reid & Duncan, Springfield, for defendant-respondent, Ralph M. Mack.

KEITH P. BONDURANT, Special Judge.

This is a personal injury action for damages sustained in a collision between a westbound motorcycle operated by defendant Malcolm Lloyd Wright, on which plaintiff was riding as passenger, and an eastbound automobile operated by defendant Ralph M. Mack. The accident occurred on September 2, 1964 at about 8:15 p. m. in the City of Springfield, Missouri.

At trial, plaintiff received a verdict in the amount of Sixty thousand ($60,000.00) dollars against defendant Wright, but the jury found in favor of defendant Mack. Defendant Wright now appeals from the judgment in plaintiff's favor; and plaintiff appeals from the judgment in favor of defendant Mack.

Since the amount in dispute exceeded Fifteen thousand ($15,000.00) dollars, this Court has jurisdiction on appeal.

The facts will be discussed in reference to the allegations of error presented by appellants as these appear in the body of the opinion. The first such allegation is raised solely by defendant Wright who contends that the trial court erred in overruling his motion for directed verdict made at the close of plaintiff's evidence, in overruling his motion for directed verdict made at the close of all the evidence, and in submitting plaintiff's case to the jury against him on the theory of negligent lookout (instruction number 2). In short, defendant Wright contends that there is insufficient evidence in the record to support the lookout submission. We do not agree. The facts presented by plaintiff at trial relevant to this issue are ample.

As stated above, this accident occurred in the evening at about 8:15 p. m. during early September. Weather conditions at the time were normal and it was dark. The collision occurred on an asphalt surfaced two-lane street approximately 20 feet wide. The street, however, had no painted center line. The headlights of defendant Mack's eastbound Cadillac were burning, as was the single headlight of the westbound Ducati motorcycle driven by defendant Wright. The roadway at and about the scene of the collision was flat and straight and the view for some distance down the road in either direction from the scene was unobstructed. Both vehicles were proceeding at only a moderate rate of speed, not more than thirty miles per hour at the time of the accident.

Plaintiff called both defendant Wright and defendant Mack as her principal witnesses concerning the facts surrounding the accident. Plaintiff herself also testified as to the events leading to the accident, but her testimony adds little to the issue at hand since she was seated behind defendant Wright and was not looking forward until she felt the motorcycle swerve immediately before impact.

Defendant Mack, whom the jury exonerated of liability, testified that he observed the single headlight of the motorcycle when it was "east of the Belt Line," a distance one of plaintiff's photographer witnesses established to be in excess of thirteen hundred feet from the house by which the accident occurred. Upon seeing the distant headlight, he edged his own vehicle approximately two feet further to the south (right) side of the unmarked roadway "to be perfectly well out of the way", although he had been on the right side of the road prior thereto. At the time of his first observation of the headlight, defendant Mack testified that it was on its proper side (north) of the road, and there remained until immediately before impact. Immediately prior to impact, however, the motorcycle suddenly swerved to its left and into his car.

Defendant Wright also admitted in his testimony for plaintiff that his own view was unobstructed for a distance of 300 or 400 yards of the accident scene, although he failed to observe the headlights of the Cadillac of defendant Mack until immediately before impact. He testified, however, that he swerved to the right rather than to the left to avoid the accident when he first observed the headlights of the approaching automobile, which he stated "were just right in front of me."

There is no question under the facts recited above but that the jury was free to find that defendant Wright negligently breached his duty to look. Defendant Mack testified that he first saw defendant Wright's motorcycle when it was at a position otherwise established to be more than thirteen hundred feet from the point of impact. If we accept, as the jury was free to do, that both drivers were traveling at approximately the same speed, then the distance between the two vehicles at the time of defendant Mack's first observation of the headlight on the motorcycle would have been nearly one-half mile. Yet, defendant Wright admitted that he did not see the headlights of defendant Mack's car until immediately before impact.

Defendant Wright, however, urges that mere failure to keep a lookout does not by itself justify a "failure to keep a careful lookout" submission. Rather, he contends plaintiff has the burden of presenting substantial evidence showing a causal connection "between the negligence pleaded and proved, and the injury claimed to have resulted therefrom." Donnelly v. Goforth, Mo.Sup., 284 S.W.2d 462, 466. He further urges that in order to justify such a submission there must be evidence that the defendant in the exercise of the highest degree of care could have seen the danger of harm soon enough to have taken effective precautionary action. Graham v. Conner, Mo.App., 412 S.W.2d 193.

Defendant Wright's statement of the law is sound, but the facts adduced at trial, we believe, were sufficient to permit the jury to find the requisite causal nexus and to establish the ability of said defendant to have taken effective precautionary action. Defendant Mack, as plaintiff's witness, it will be recalled, testified that defendant Wright swerved his motorcycle left into his car; and, although defendant Wright contradicted defendant Mack as to the direction in which he turned, admitted that he failed to see the oncoming automobile until immediately before impact. Moreover, each driver testified that he himself was driving on the proper side of the road at all times before the accident.

The jury was free to believe all these facts. Thus, if the jury believed that defendant Wright did swerve left into the other vehicle immediately before impact, it could conclude from this fact that defendant Wright not only was negligent in his failure to observe that which could readily be seen, but also that because of this failure to observe he negligently caused the collision by suddenly swerving into the oncoming vehicle when he first observed it. Effective precautionary action in such a case would have been merely to have stayed in his proper lane of travel, and to have refrained from turning left. Causation is obvious: But for the failure of defendant

Wright to maintain a vigilant lookout no accident in fact would have occurred, assuming these facts to be true. Had he seen the other vehicle before he did, he would not have turned left when he saw it.

This is not a case such as Donnelly v. Goforth, supra, where there was " * * * nothing in evidence tending to show what defendant could have seen in the exercise of the highest degree of care in looking." (284 S.W.2d 1. c. 466.) In this case there is affirmative evidence that this defendant created danger of a collision, which in fact subsequently occurred, by swerving in reaction to seeing headlights he obviously could and should have seen much earlier.

The facts here are far more akin to dicta cited by this Court in the same case: " * * * one having a duty to look out may not escape liability by saying that he did not see what, if he had looked, he could have seen." (l. c. 465.)

The fact situations in the other cases relied upon by defendant Wright are not analogous and the cases are not, therefore, treated here. Accordingly, we conclude that defendant Wright's first point of error is without merit.

The next allegation raises an issue which has often proved troublesome for trial courts in this state. The jury in this case first returned a verdict in the following form:

"We, the jury, find the defendant Wright guilty as charged.

Signed: Lloyd Wardell

"We, the jury find the defendant Mack not guilty.

Signed: (Nine jurors including juror Wardell)

"We, the jury find the issues in favor of the plaintiff and against defendant Wright and we assess plaintif damages at $60,000.00 and we further find the issues in favor of the defendant Mack.

Signature: Lloyd Wardell"

Upon receipt of this verdict the trial court called counsel to the bench. In a brief colloquy he mentioned the apparent ambiguity in the above verdict, noting the failure of juror Wardell to add the word "foreman" after his name where he alone signed. He requested the recommendation of counsel on what course he should take in advising the jury; and counsel for defendant Wright at that time stated that he would object to any comment by the Court other than advising the jury the verdict was not in proper form. The bench conference thereafter ended and the following exchange occurred in open court:

"THE COURT: Members of the jury, the verdict handed to the Court and read by the Court to all of you does not follow the form in the instructions. The Court is going to have to ask you to return to your jury room and asks you to follow the form set out in the instructions, whatever form is appropriate for your verdict, and—

MR. TURNER: (Counsel for defendant Mack): Your Honor, may I approach—

THE COURT: I believe this, that it should be done on the reverse side of this one you've already brought in.

JUROR WARDELL: Your Honor, would you state what is wrong with it so we won't have to look through all those again.

MR. TURNER: Your Honor, from the standpoint of the defendant Mack the Court may do so.

THE COURT: May make such a statement from the standpoint of the defendant Mack?

MR. TURNER: Yes, Your Honor.

THE COURT: Is there any further objection?

MR. CLAMPETT: (Plaintiff's counsel) We have no objection.

THE COURT: Does the defendant Wright have any objection?

MR. FISHER: (Counsel for defendant Wright): Yes, Your Honor, we stick to our objection we made before in the record."

Following another brief conference at the bench, the details of which are not pertinent here, the Court again instructed the jury as follows:

"THE COURT: Mr. Wardell, and members of the jury: The Court again refers your attention to Instruction Number 10 which contains possible forms of verdict. I might point out on the verdict you've handed to the Court, at the bottom of the last paragraph, followed by the name of Lloyd Wardell does follow one of the forms of verdict. There is written above it, however—well, I might point out, if that was meant by the jury to be a unanimous verdict in that paragraph, the word foreman should be put under your name. Now, we don't know what the material above it means and it is not the intention of the Court to be suggesting in any way what your verdict should be or to try to get you to bring in any particular verdict, that's your function and your responsibility. On the other hand, we want to be sure that we understand what you bring in. Now, Mr. Wardell, you might want to say something.

JUROR WARDELL: I was just going to ask, I left off the word foreman before my name, is that true, this first paragraph is one and then the undersigned under the second paragraph and then the third is individual.

THE COURT: Does that mean to say that it was unanimous in finding in favor of the plaintiff and against the defendant Wright?

JUROR WARDELL: Yes, sir.

THE COURT: And it was a nine juror verdict in finding in favor of the defendant Mack and against the plaintiff?

JUROR WARDELL: We felt insufficient evidence, uh-huh.

THE COURT: And then we come down to the bottom and you don't have the word foreman in there nor do you have the name of any more than one juror. Now this last paragraph, I'm going to have to—with permission of counsel, I'll ask further about it.

MR. TURNER: Anything, yes, sir.

THE COURT: We're trying to get at what was done and I'm not trying to suggest what you ought to do, I want to make that clear.

JUROR WARDELL: Well, the way I read it, I shouldn't have signed each one, the way I understood it in your instruction each one should have been signed, according to the reading of your instruction, unless it was in favor of both defendants, and you could use that one last paragraph without using the other, but the way the instructions read I should have signed each one.

THE COURT: Gentlemen, let me have another conference, please."

A prolonged conference in chambers ensued, again the details of which are unnecessary to relate here. The Court thereafter instructed the jury merely to return to the jury room since "the paper handed to the Court [was] not in proper form." The verdict finally returned by the jury took the following form:

"We, the jury, find the issues in favor of the plaintiff and aginst (sic) defendant Wright and we assess plaintiff's damages at $60,000.00, and we the undersigned Jurors find the issues in favor of the defendant Mack.

Signed (Nine jurors including juror Wardell)."

Defendant Wright now contends that the first verdict was improper and that the Court's subsequent remarks to the jury, and the remarks of counsel for defendant Mack and plaintiff influenced the ultimate form of the verdict to defendant Wright's prejudice. He urges that the trial court erred in overruling his motion for mistrial based on these grounds, but we find no impropriety in either the conduct of the trial court nor opposing counsel that prejudiced defendant Wright. In the first place, the Court's comments to the jury do not constitute improper oral instructions implicitly prohibited by Missouri Rule of Civil Procedure 70.01, V.A.M.R. and Baker v. Fortney, Mo.App., 299 S.W.2d 563, 566, relied upon by defendant Wright. In fact the trial court in this case did precisely what this Court has outlined as proper procedure in such a case: " ' * * * "The only proper and safe way to correct * * * an ambiguity in the verdict is for the trial court at the time of its rendition to call the attention of the jury to the defect and have the correction made in the verdict before it is received and recorded." ' " Thorne v. Thorne, Mo.Sup., 350 S.W.2d 754, 758, quoting with approval from Singleton v. Kansas City Baseball & Exhibition Co., 172 Mo.App. 299, 157 S.W. 964, 966. Here, it will be noted, the trial court pointed out the defect, the failure to add the word foreman after the name Wardell on the first verdict, and refused the first verdict, adding numerous admonitions that the Court in no way intended to influence the jury's decision. Secondly, the comment of defendant Mack's counsel remained within the realm of normal and proper advocacy. We find no error on this ground.

Defendant Wright also contends that the Court's admission of certain photographs, Plaintiff's exhibits 13, 16, 18, 19, 21, 23, 24 and 25, was prejudicially erroneous. It is claimed that the photographs were inflammatory, created bias and prejudice and were cumulative. Careful scrutiny of these black and white photographs of the plaintiff taken at various stages of her three-year course of treatment reveals no such probable effect. The trial court carefully examined each of the exhibits questioned here as well as others preferred by plaintiff. Several were excluded by the trial court because of possible prejudicial or cumulative effect.

All of the photographs were properly authenticated by plaintiff herself, both as to subject matter and as to the time they were taken relative to her course of treatment and recovery; all of the admitted photographs bore upon plaintiff's pain and suffering, prolonged hospitalization and other elements of damage which were directly in issue in the case.

■ Although it is true, as this Court stated in Faught v. Washam, Mo.Sup., 329 S.W.2d 588, 600, " * * * our courts properly have concerned themselves not only with appropriate identification of the particular photograph as a true and accurate portrayal of that which it purports to show but also with the question of whether the photograph was prejudicial and inflammatory * * *", a court need not exclude a photograph otherwise probative merely because it reflects serious injuries. Defendant Wright relies heavily upon Kickham v. Carter, Mo.Sup., 314 S.W.2d 902, in which this Court sustained a trial court's order for new trial after plaintiff's doctor illustrated his testimony of a laminectomy with four photographs of plaintiff's disc operation. One of the photographs in that case pictured fragments of the removed intervertebral disc. The Court's holding in that case hinged upon a finding that the jury's verdict on liability could have been tainted by the use of such pictures. That case obviously did not hold that all photographs showing a course of treatment of an injured plaintiff should be excluded merely because the particular photographs there in question purported to illustrate various stages of plaintiff's operation. Nor did our holding in Haley v. Byers Transportation Co., Mo.Sup., 414 S.W.2d 777, imply such a theory. In that case this Court simply affirmed the trial court's exclusion of motion pictures proferred by plaintiff, which showed the injured plaintiff engaged in various activities in his home which illustrated his ability to move about, exercise and perform other manual tasks. The trial court in its discretion believed and this Court recognized that the film represented hearsay testimony by the plaintiff through his conduct. None of the apparatus used in the film to illustrate plaintiff's disabilities were presented at trial.

■ The instant case stands in stark contrast to either of the above situations. The eight photographs here in question depict: (1) the condition of plaintiff's legs a few weeks after the accident during the time of her first hospitalization (Ex. 13); (2) plaintiff in a pelvic sling, taken also during this period (Ex. 16); (3) plaintiff upon a standing board, a device by which, according to her testimony, plaintiff learned to stand in an upright position before being fitted for a brace (Ex. 19); (4) the condition of plaintiff's leg nearly two years after the accident, taken while plaintiff was at the Mayo Clinic (Ex. 21); (5) plaintiff lying in a hospital bed, her leg elevated in a "Pearson Splint" also taken at the time of her hospitalization at the Mayo Clinic (Ex. 18); (6) plaintiff using a cane, also photographed during this latter time period (Ex. 23); (7) a scar on plaintiff's right thigh resulting from its use as the donor site of a skin graft (Ex. 24); (8) and, finally, a close-up view of plaintiff's legs showing plaintiff's injury to her left leg as it appeared in 1966 (Ex. 25). We can find nothing in these photographs calculated to produce prejudice.

■ Finally, remittitur is sought. We believe, however, that the $60,000.00 verdict under the circumstances of this case is entirely reasonable. Certainly, we do not believe that it is so excessive as to justify disturbing the jury's finding. Plaintiff's injuries immediately following the accident were severe. By the testimony of Dr. Yancey, a physician who treated plaintiff the day following the accident, her condition at that time was as follows: (1) a severe bruise and abrasion of the right shoulder; (2) compound fractures of the pelvic bone with a dislocation of the right sacroiliac joint; (3) a tear of the vaginal wall where the pelvic bone came through the entire wall; (4) a laceration of the uretha;

(5) an extensive compound fracture of the shaft of the left femur; (6) a sprain of the left knee; (7) an extensive compound fracture of the left tibia and fibula; (8) a marked laceration of the soft tissue about half-way between the knee and ankle, which was discolored, and the result of a severe crushing injury; (9) a sprain of her left ankle; (10) a fracture of one of the bones in her left foot; (11) and many bruises and areas of discoloration over her entire body.

The above observations of Dr. Yancey were made on September 3, 1964, the bare commencement of a protracted first period of hospitalization which extended approximately five months. For six weeks of this time period plaintiff was in a pelvic sling; and even at the time of her release still had to use a leg brace and crutches. Thereafter, plaintiff was periodically treated by Dr. Yancey until May 31, 1966 at which time he referred her to the Mayo Clinic for "further work on the fracture site" which had developed "dense scar tissue" by that time.

While at the Mayo Clinic plaintiff received three bone grafts in an operation performed June 6, 1966 in which bone was taken from the pelvis and grafted to the femur. Following this operation, plaintiff was placed in a "Pearson Splint" to keep her immobilized. She remained in this device until June 28, 1966 when she again received surgery, on this occasion to remove a nail from the left femur. Immediately thereafter, she was placed in a plaster of paris cast "which extended from the chest cage to the toes on the left and the knee on the right." She remained in this device at the time of her discharge from Mayo's Clinic on July 4, 1966.

Plaintiff was rehospitalized in November of 1966 for a two-week period, for physical therapy and to determine whether a prosthetic device should be used to improve the physical appearance of her left leg, a device which plaintiff did in fact later acquire and will continue to wear in the foreseeable future.

On September 9, 1968, the day of the trial, four full years after the accident, plaintiff was again examined by Dr. Yancey, who found:

(1) The scars resulting from the operation;

(2) a one-half inch shortening of the left lower extremity;

(3) some tenderness in the symphis pubis;

(4) atrophy in the left thigh;

(5) loss of motion and lateral instability in the left knee;

(6) marked creaking in the knee joint of that knee;

(7) swelling of the left calf;

(8) a marked defect in the soft tissues of the left leg which measured three and a half by four inches in size; and,

(9) loss of motion in the left ankle.

X-rays revealed: (1) arthritic type changes taking place about the right sacroiliac joint; (2) slight deformity of the pubic area; (3) some roughening of the articular surface of the tibia; and (4) diminution of joint space in that area.

Dr. Yancey estimated that plaintiff's permanent disability is "about 40% of the left lower extremity." He further expressed the opinion that plaintiff can anticipate traumatic arthritis in the right sacroiliac joint as well as arthritic changes in the left knee, accompanied by pain, swelling and weakness there for an indefinite period of time.

Dr. Yancey's prognosis was largely corroborated by Dr. Lipscomb, who treated plaintiff at Mayo's Clinic. He also foresaw the likelihood of arthritis, although he expressed the opinion that plaintiff has 25% permanent disability in the left leg.

At the time of this accident, plaintiff was twenty years old and as a result of it she missed three full semesters of school. The

medical expenses which had accrued from her twenty-first birthday to the time of trial amounted to $5,737.91.

In light of the foregoing facts concerning plaintiff's condition, we cannot say that the jury's verdict was excessive. Defendant Wright directs our attention to Boydston v. Burton, Mo.Sup., 379 S.W.2d 536, decided by this Court in 1964, in which a $20,000.00 remittitur was ordered on a $60,000.00 verdict for a 21-year-old female plaintiff who, inter alia, sustained serious injuries to her right leg. We are not, however, convinced that her leg injuries and her other injuries are necessarily analogous to those in the instant case. For example, the severe indention wound to the instant plaintiff's injured leg alone sufficiently removes this case from close comparison with Boydston. Moreover, six years have elapsed between the dates of the two cases and in the interim inflation has continued apace. Remittitur is, therefore, denied.

With reference to plaintiff's appeal from the judgment in favor of defendant Mack, the sole contention made in this Court is that if we should find that what occurred with reference to the form of verdict was improper and prejudicial so as to require a new trial for defendant Wright on that basis, it likewise would infect the verdict in favor of defendant Mack and plaintiff should be granted a new trial as to him for that reason. Having decided, as heretofore indicated, that there was no prejudicial error in what occurred with respect to the form of verdict, we hold that plaintiff is not entitled to a new trial against defendant Mack and that plaintiff is not entitled to relief on her appeal.

Judgment affirmed.

DONNELLY, P. J., and FINCH, J., concur.

MORGAN, J., not sitting.