**Cary P. MORGAN, Plaintiff-Respondent,**

**v.**

**Michael S. TOOMEY, Defendant-Appellant.**

**No. 49678.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 4, 1986.

James E. Godfrey, St. Louis, for defendant-appellant.

Walter L. Floyd, Clayton, for plaintiff-respondent.

SATZ, Judge.

This is a personal injury action. Plaintiff, Cary Morgan, was struck by a car driven by defendant, Michael Toomey. The jury found defendant 95% at fault and plaintiff 5% at fault. Plaintiff's judgment was $53,568.87. Defendant appeals. We reverse and remand.

Plaintiff submitted his case on three alternative theories of negligence: defendant drove at excessive speed or failed to keep a careful lookout or failed to swerve. On appeal, defendant contends plaintiff failed to present substantial evidence to support the "lookout" and "failure to swerve" instructions. In effect, defendant argues plaintiff failed to make a submissible case on either of these two theories.

To resolve this issue of submissibility, we view the evidence and inferences in

the light most favorable to the submissions and disregard all contrary evidence and contrary inferences. *McColgin v. Morgan,* 592 S.W.2d 263, 266 (Mo.App.1979). We then determine whether the evidence so viewed makes plaintiff's theories of defendant's negligence more probable than not. *Bentley v. Crews,* 630 S.W.2d 99, 104 (Mo. App.1981). Within these guidelines, we have reviewed the present record.

The record is not a model of clarity or precision. It does reveal plaintiff was injured on a parking lot adjacent to a number of commercial buildings. However, when the witnesses referred to the photographic exhibits in evidence, most of their references were not marked on the referred-to exhibits. Also, the photographs of the parking lot were not marked with points of the compass to help determine direction, and neither counsel nor the witnesses used compass directions when referring to the lot or the photographs of it. For clarity, we have marked compass points on a schematic diagram of the parking lot. These points square with the evidence as we understand it.

With this diagram as background, the record does reveal the following facts. Late one evening in February, 1982, plaintiff and two friends went to a bar, which, apparently, was located just north of the parking lot. Plaintiff and defendant had a battle of words inside the bar. Plaintiff and his two friends, Kevin Kenney (Kenney) and Dan Bragg (Bragg), left the bar thirty minutes later, about one A.M. They walked directly to Bragg's car. The parking spaces painted on the lot were at 45 degree angles to the north and south axis of the lot. Bragg's car was parked, facing south-west. As plaintiff and his two friends were about to enter the car, defendant appeared, driving his car north, in the aisle adjacent to and immediately east of Bragg's car. The defendant stopped his car across from Bragg's car and shouted

obscenities at plaintiff. Plaintiff responded, and more words were exchanged. Defendant then got out of his car, walked to the passenger side of Bragg's car, where plaintiff was standing, and punched plaintiff. Bragg came around from the driver's side of his car, jumped on the defendant's back and wrestled him to the ground. The scuffle broke up, and defendant got back into his car. Plaintiff walked up to defendant's car, reached through the window and grabbed defendant by the shirt, warning him not to bother the three of them anymore.

Defendant then drove north down the aisle toward the commercial buildings, turned around and drove back south, up the aisle. The night was clear, the parking lot was well lit, and defendant had his headlights on. Although it is not clear just exactly where plaintiff, Kenney and Bragg were located when defendant started to drive south, up the aisle, they were at or near the rear bumper of Bragg's car. Each testified that none of them were "in the aisle". As the defendant's car approached, plaintiff was standing alongside the rear of Bragg's car, by the rear bumper, just to the right of the license plate. Defendant's car, traveling south, up the aisle, "swooped" or "swerved" to the southwest, to defendant's right, in toward Bragg's car, where plaintiff was standing, and sideswiped it. Plaintiff did not see defendant's car until it was two feet away from him. He immediately tried to avoid the car's path by jumping on Bragg's trunk. Plaintiff's right calf was crushed between the defendant's right front bumper and Bragg's rear bumper.

Plaintiff's submission on "lookout" and "failure to swerve" were standard MAI:

> Your verdict must be for Plaintiff and you must assess a percentage of fault to Defendant, if you believe:
>
> First, either Defendant failed to keep a careful lookout, ..., or defendant, knew, or by the use of ordinary care could have known that there was a reasonable likelihood of collision in time thereafter to have swerved, but defendant failed to do so, and....

As reflected in this instruction, under the MAI for "failure to swerve", MAI 17.04, the instruction expressly submits defendant's ability to realize an accident could occur in sufficient time to swerve. It is said a similar but unexpressed submission is made in the "lookout" instruction. *E.g., Allen v. Andrews,* 599 S.W.2d 262, 265 (Mo.App.1980). In the "lookout" instruction, the time, distance means and ability to take effective precautionary action are not expressed but are submitted implicitly. MAI 17.05. *E.g., Heberer v. Duncan,* 449 S.W.2d 561, 563 (Mo. banc 1970); *Zalle v. Underwood,* 372 S.W.2d 98, 102 (Mo.1963); *Allen v. Andrews, supra* at 265. Thus, to submit the "lookout" instruction, it is said, the plaintiff must still show when the defendant knew or should have known the potential danger could occur and the plaintiff also must show the defendant had time thereafter to take effective precautionary action. *E.g., Heberer v. Duncan, supra* at 563; *Bunch v. McMillian,* 568 S.W.2d 809, 811 (Mo.App.1978). Consequently, to submit either the "failure to swerve" or the "lookout instruction" here, it would appear plaintiff had to show when the potential danger of collision should have become actually or constructively apparent to defendant and also had to show defendant had sufficient time thereafter to "swerve" or take other effective precautionary action. This apparent similarity between the submissibility requirements of "lookout" and "failure to swerve" instructions is deceptive.

In certain fact situations, our Supreme Court has applied the duty to keep a careful lookout so that time, distance, means and ability are not as crucial as those facts are under the duty to swerve. *McWilliams v. Wright,* 460 S.W.2d 699, 700–702 (Mo.1970); *see also Williams v. Christian,* 520 S.W.2d 139, 142–144 (Mo. App.1974). It has even been said, incorrectly we think, that *McWilliams* and *Williams* did not require "evidence of time and distance" to submit a "lookout" in-

struction. *Schneider v. Finley,* 553 S.W.2d 727, 730 (Mo.App.1977).

In *McWilliams,* plaintiff was riding as a passenger on a westbound motorcycle, driven by defendant. They were traveling at night with the motorcycle's lights on. The evidence, viewed most favorably to plaintiff, showed defendant swerved the motorcycle into the eastbound lane of traffic and collided with an eastbound car, also traveling with its lights on. On appeal, defendant contended plaintiff failed to show defendant could have seen the danger of harm soon enough to take effective precautionary action and, thus, plaintiff failed to support his "lookout" instruction. In rejecting this contention, the Court stated defendant could have seen the car's headlights "nearly one-half mile" away and

> ... if the jury believed that defendant ... did swerve left into the other vehicle immediately before impact, it could conclude from this fact that defendant ... not only was negligent in his failure to observe that which could readily be seen, but also that because of this failure to observe he negligently caused the collision by suddenly swerving into the oncoming vehicle when he first observed it. Effective precautionary action in such a case would have been merely to have stayed in his proper lane of travel, and to have refrained from turning left. Causation is obvious: But for the failure of defendant ... to maintain a vigilant lookout no accident in fact would have occurred, ... Had he seen the other vehicle before he did, he would not have turned left when he saw it.
>
> ... [Here], defendant created [the] danger of a collision, which in fact subsequently occurred, by swerving in reaction to seeing headlights he obviously could and should have seen much earlier. *Id.* at 702.

Our colleagues in the Western District applied this reasoning in *Williams v. Christian,* 520 S.W.2d 139 (Mo.App.1974). In *Williams,* plaintiff was standing "one to one and a half steps" south of the south edge of an eastbound lane of traffic. Defendant, traveling east in her car, could have seen plaintiff when defendant was over 1000 feet away. Defendant did not see plaintiff before she hit him. The trial court refused to give plaintiff's "lookout" instruction. Instead, it gave a res ipsa loquitur instruction. In holding the trial court should have given plaintiff's "lookout instruction," the Court relied on *McWilliams* and stated defendant's effective precautionary action "would have been merely to have continued east on the travel portion of the road ..., and to have refrained from changing course and direction of her vehicle so as to cause it to go partially on to the south shoulder of the road ..." *Id.* at 144. The Court went on to state:

> Although it is true that there is no evidence ... as to the distance between [plaintiff] and [defendant's] vehicle when [defendant] changed its course and direction, there is evidence that when [plaintiff] first saw [defendant's] oncoming vehicle, and prior to the impact, it was approximately [1000 feet] west of where [plaintiff] was standing clear of the traveled portion of [the] road, and at which time [defendant's] oncoming vehicle was headed east and was entirely on the traveled portion of [the] road.
>
> . . . . .
>
> Neither *McWilliams* nor the instant case represent a nuance or exception to the prevailing rule in this state relative to the submissibility of actionable negligence predicated on failure to keep a careful lookout. They merely represent definitive fact situations where the absence of evidence as to precise time and distance does not preclude submissibility of failure to keep a careful lookout as being the proximate cause of an accident. ... [Plaintiff] made a submissible case under his version of the facts and the theory of the case—that [defendant's] vehicle struck him while he was standing on the south shoulder and clear of the traveled portion of the [road] as a direct result of [defendant's] failure to keep a careful lookout. *Id.* at 143–144.

If *McWilliams* and *Williams* do not "represent a nuance or exception to the prevailing rule" in "lookout" submissions, they do represent an application of the duty to keep a careful lookout peculiar to their respective fact situations. As a basic premise, the duty to keep a lookout is continuous. *E.g., Max v. Reidler,* 559 S.W.2d 46, 47 (Mo.App.1977). It is not only continuous, however. In a sense, it is also generic, for at some point in time, as the duty to keep a lookout continues, the concomitant duty to take effective precautionary action is triggered and the latter duty encompasses the specific duty to stop or slacken speed or sound a warning or swerve and the like. *E.g., Zalle v. Underwood, supra* 372 S.W.2d at 102 (Mo.1963).[1] Thus, normally, to make a submissible case under the generic duty to keep a lookout, the plaintiff must show the time when and the distance at which the potential danger of a collision triggers the specific duty to take effective precautionary action. *Heberer v. Duncan,* 449 S.W.2d at 563; *Bunch v. McMillian,* 568 S.W.2d at 811. The need to show this latter time and distance was eliminated by the courts in *McWilliams* and *Williams* in their respective fact situations. They did not, however, completely eliminate the necessity of showing time and distance in all "lookout" submissions. In each case, the court carefully determined where the defendant could first have seen plaintiff and then held the defendant liable for acting as he did and creating the danger, rather than, as in the usual lookout submission, holding the defendant liable for failing to act after the danger should have been realized. The present facts are similar to the facts in *McWilliams* and *Williams.* We follow their holdings and teaching, absent further direction from our Supreme Court. In so doing, we find plaintiff's evidence here supported the submission of the "lookout" instruction.

Viewing the evidence most favorable to plaintiff, defendant was some 40–50 yards north of plaintiff, after defendant had turned around and at the time he began driving south up the aisle. He was going 10–15 mph.[2] In law, defendant is deemed to have seen what can be seen. *Lewis v. Rynkowski,* 639 S.W.2d 842, 843 (Mo.App.1982). The record shows nothing obstructing his vision. The night was clear, the parking lot well lit, and defendant had his headlights on. Both Kenney and Bragg, standing close to plaintiff, saw defendant's car when it made its U-turn, and Bragg saw defendant's car throughout the time it came south, up the aisle and collided with plaintiff. Conversely, defendant should have been able to see plaintiff. (See Appendix).

Plaintiff and his two witnesses, Kenney and Bragg, each testified that plaintiff was not "in the aisle" when defendant started south, back up the aisle. Kenney, for example, said neither he nor his friends were "out in the lane blocking [defendant's] way." (See Appendix). From what can be gleaned from the record, photographs included, plaintiff was standing immediately adjacent to the rear bump-

1. Quite often, as here, a "failure to keep a lookout" instruction, MAI 17.05, is submitted alternatively with an instruction on "failure to swerve" or "stop" or "slacken speed" and the like. MAI 17.04. *See, e.g., Willard v. Kansas City Transit, Inc.,* 465 S.W.2d 638 (Mo.1971); *Brittain v. Clark,* 462 S.W.2d 153 (Mo.App.1970); *Hawkeye-Security Ins. Co. v. Thomas Grain Fumigant Co.,* 407 S.W.2d 622 (Mo.App.1966). These submissions under MAI 17.05 and MAI 17.04 have been held to be separate and distinct submissions. *E.g., Willard v. Kansas City Transit Inc., supra* at 641; *Sweatman v. McClure,* 416 S.W.2d 665, 667–668 (Mo.App.1967). They are not, however, mutually exclusive submissions, and, under MAI 17.05, failure to keep a lookout, a party may argue, on appropriate facts, that the breach of duty was the failure to keep a lookout and the subsequent failure to swerve, stop, slacken speed and the like. *See, e.g., Zalle v. Underwood, supra* 372 S.W.2d at 102 (Mo.1963). Thus, quite often, as here, the submission on alternative theories of negligence under MAI 17.04 and MAI 17.05 is merely another manifestation of the legal mind's long lasting love affair with redundancy and tautology.

2. This is the most favorable evidence of defendant's speed and distance. For example, plaintiff's witness Kenny testified defendant's car traveled about 25 yards and was going about 20–25 mph when defendant's car struck plaintiff.

er of Bragg's car at the west edge of the aisle. Defendant did not drive in a straight line south, up the aisle and run into plaintiff. Defendant drove straight south, up the aisle, and, at some unknown time before the collision and at some unknown distance from plaintiff, defendant's car swerved to its right, angled toward the southwest and struck plaintiff. (See Appendix) Plaintiff's failure to show when and where defendant's car swerved does not preclude him from making a submissible case on "lookout" however. Using the reasoning of *McWilliams* and *Williams,* defendant could have seen plaintiff standing immediately at the west edge of the aisle when defendant was 40–50 yards away. If defendant would have driven straight south, he would have avoided the collision. He did not. At some point, his car swerved right, to the southwest and then collided with plaintiff. Thus, following *Williams* and *McWilliams,* "but for" the failure of defendant to maintain a proper lookout no accident or collision would have occurred.

This same reasoning, however, does not apply to plaintiff's instruction on "failure to swerve". Defendant's duty to swerve, as properly set out in plaintiff's instruction, arose at the moment defendant knew or should have known a collision would likely occur. MAI 17.04. *E.g., Wardenburg v. White,* 518 S.W.2d 152, 154 (Mo.App.1974). Defendant breached this duty if, thereafter, he had the time, distance, means and ability to avoid the collision by swerving and he failed to do so. *Id.* As previously demonstrated, plaintiff failed to establish when defendant's duty to swerve away from plaintiff arose. Plaintiff simply showed defendant began driving south up the aisle and, at some unknown distance from plaintiff and at some unknown time prior to the collision, defendant swerved right, to the southwest, toward plaintiff. No explicit evidence was introduced to show defendant's speed and defendant's distance from plaintiff at the time defendant should have become aware of the danger of a collision.

Plaintiff did say he saw defendant's car coming directly toward him when it was 2 feet away, and defendant did say he was driving 10 to 15 miles per hour up the aisle. This evidence, however, does not help plaintiff. At best for plaintiff, defendant would be driving 10 mph or about 15 feet/second. Given defendant's normal reaction time as 3/4 second, *e.g. Sandifer v. Hamilton,* 626 S.W.2d 439, 441 (Mo.App.1981), defendant would have traveled some 11 feet before he could have started to swerve back to his left, away from plaintiff. Thus, plaintiff did not introduce sufficient evidence to warrant the submission of the failure to swerve instruction. *E.g., Wardenburg v. White supra,* 518 S.W.2d at 154.

Plaintiff attempts to support this submission by characterizing the present fact situation as an "almost escaping case" and by arguing "only a fraction of a second [was] needed for plaintiff to get clear *or* for defendant to take 'the slightest action' to avoid injury." (emphasis his). "If", plaintiff argues, "defendant's car had been turned ('swerved') a matter of *less than six inches* to the left the injury would not have occurred." (emphasis his) We disagree.

We have read those cases cited by plaintiff, as well as others, defining just what constitutes an "almost escaping case." To us, the present facts do not fit within the definition. But even if they did, plaintiff would not prevail.

Plaintiff rests his argument on the assumption defendant's car could have been swerved away from plaintiff instantly, and he notes our Supreme Court has stated:

> "It is too generally and well known to require formal proof that present day automobiles respond quickly and accurately to the touch of the driver's hand on the steering wheel. The necessary impulse may be applied in an instant." *Brown v. Callicotte,* 73 S.W.2d 190, 193 (Mo.1934).

Just what time span "in an instant" covers is not clear. Applied here, as plaintiff argues, "in an instant" would have to be 0.13 second.

Defendant was driving due south, up the aisle, at 15 feet/second. His car swerved to his right, to the southwest and, from what can be gleaned from the record, he was, at that point, 2 feet away from plaintiff. Traveling at 15 feet/second, defendant's car would travel 2 feet in 0.13 second. Thus, under plaintiff's argument, defendant would have had to react to the probable collision in less than 0.13 second and swerve his car back to the left, southeast to avoid the collision. Judicially noticed reaction time has consistently and repeatedly been 0.75 second. *E.g., Sandifer v. Hamilton,* 626 S.W.2d at 441.[3] This reaction time, the present record and common sense preclude us from indulging in the speculation urged by plaintiff. Plaintiff had his day in court and simply failed to make a submissible case on "failure to swerve."

Judgment reversed. Cause remanded.

CRANDALL, P.J., and PUDLOWSKI, J., concur.

APPENDIX

*Kenney*

*Direct Examination*

Q. And then what happened?

A. Then [defendant] drove up this aisle at a good rate of speed until he got toward the end.....

. . . . .

A. ... Before [defendant] got to the end, he spun around, came around our [sic] here and back toward us. [Plaintiff] tried to jump upon the back of [Bragg's] car, which would have been the trunk, trying to get out of the way. [Defendant's] car, front right bumper, crashed into [Bragg's] right front side, which continued to come out of the parking lot, swerved over here and down and out.

. . . . .

Q. Now, when [defendant's] automobile was coming back through the parking lot, coming back toward you, making the turn as you said, were you or any of your friends out in the lane blocking his way?

A. No, sir.

*Bragg*

*Direct Examination*

Q. So that's when [defendant] started down the aisle after making the U-turn, you all were at your car?

A. Yes.

Q. From that point on did any of you get back out in the aisle for any reason?

A. No, everybody was trying to stay out of the way of his car.

Q. What, did any of you ever step out into the aisle to try to stop his car, beat on his hood, fender?

A. No.

Q. Tell us what happened when [defendant] turned around with his Camaro, was coming back down the aisle toward your car.

A. He went up, made that turn, came back down, straight back down that aisle, his car did swerve over toward my car where [plaintiff] was standing, at the rear of my car and he got right on top of us.... [Plaintiff] was at the back of my car, he jumped up trying to avoid his car.

. . . . .

Q. When he jumped up on the back of your car ... how did he jump up?

A. He jumped into kind of a sitting position to a point right there where, I'd say his rear end was on the top of my car and legs dangling down alongside the bumper.

3. The appellate courts have a penchant for taking judicial notice of reaction time, stopping distances and the like, even though no request was made at trial that judicial notice be taken of a fact in issue and, thus, even though no opportunity was given to argue against judicial notice being taken. *See, e.g., Richardson v. Wendel,* 401 S.W.2d 455, 458 (Mo.1966); *see generally,* Mo. Bar Cle, *Problems of Proof,* § 12.163–12.168 (1984 Supp.). We follow that practice here.

Q. Then what happened?

A. He then, [defendant's] car hit him, he just came very close to my car kind of side swiped my car, came in that type of an angle.

Q. You're indicating kind of a swooping motion?

A. Yes.

*Plaintiff*

*Direct Examination*

Q. Did you see [defendant's] car after ["you left his car" and "went back to your car"]?

A. The next time I saw [defendant's] car was when he reared around here and I was still standing by the end of the bumper in the back and I saw it was about two feet away from me.

Q. Now, when the car was two feet away from you, what angle was it coming. Was he coming straight down the aisle or where was he?

A. Well, he kind of went around this way. He was going kind of fast and he kind of like fishtailed it around real fast and coming this way so it was coming directly this way.

Q. Now, I have two little model cars.....

. . . . .

Q. Show us how his car went by you or came to your car.

A. ... [W]ell let's see, we will do it this way, his car was like this. He kind of fishtailed around real fast.

. . . . .

A. And he kind of fishtailed around and made his turn and was coming back directly towards the out lane of the parking lot.

Q. How did the cars come together?

A. Well, after he made his turn, he finished his turn down here. So by the time he had made his turn, he was coming back directly this way and that's where he kind of sideswiped and grazed my leg and that's where he knocked [Bragg's] little plastic chip off his bumper there. It was kind of of like a swooping kind of motion.

Q. He made kind of a swooping motion when he hit you. Was any other car parked in the parking space he came to?

A. No.