**ST. JOHN'S REGIONAL HEALTH CENTER, INC., Plaintiff–Respondent,**

**v.**

**Kelly WINDLER, Defendant–Appellant.**

**No. 18100.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 3, 1993.

Rob J. Aiken, Bacon, Lewis & Aiken, Springfield, for defendant-appellant.

Frank M. Evans, III, Ed L. Payton, Miller & Sanford, P.C., Springfield, for plaintiff-respondent.

SHRUM, Judge.

On April 7, 1992, the trial court dismissed the defendant Kelly Windler's counterclaim against the plaintiff, St. John's Regional Health Center, Inc. The court found that Windler's counterclaim—a counterclaim charging St. John's with false imprisonment of Windler—was barred because of her failure to file a health care affidavit mandated by § 538.225.1, RSMo 1986.[1] As a premise to its ruling the trial court said, "St. John's was acting only in its capacity as a health care provider...." Windler appeals from the judgment of dismissal.[2]

The issue in this case is whether, as a matter of law, the health care affidavit described in § 538.225.1, RSMo 1986, has to be filed in a false imprisonment case brought against a hospital, when, at the time of the incident, the hospital was acting in its capacity as a health care provider. We conclude that under the circumstances shown by this record, the filing of an affidavit was mandatory. We affirm.

## FACTS

On July 29, 1991, St. John's sued Windler, claiming that she owed $513.78 for medical and hospital care rendered to her on November 15 and 16, 1990. Windler filed an answer in which she admitted that St. John's was a corporation but denied all other allegations. By a contemporaneously filed counterclaim Windler charged that for two days, St. John's, acting through its employees, detained her against her will, kept her imprisoned, and restrained her of her liberty, all by means of threats and force; that this incident occurred in a building occupied by St. John's in which it operated a psychiatric hospital; and that by reason of such imprisonment she was humiliated and embarrassed, her reputation was damaged, her nerves were shocked, she suffered severe emotional upset, and she was thereby damaged in the amount of $15,000. St. John's moved for the dismissal of Windler's counterclaim, citing her failure to file the § 538.225 affidavit.

Initially, the trial court ruled it would take the motion with the case. Later, relying on *Jacobs v. Wolff*, 829 S.W.2d 470 (Mo.App.1992), St. John's asked the trial court to reconsider its earlier action regarding the motion to dismiss. Windler opposed such request, arguing in a written memorandum filed with the trial court that reliance on *Jacobs* by St. John's was misplaced. In her memorandum she represented to the trial court that "[t]he evidence will show that [Windler] was unlawfully restrained by [St. John's] under threat of Sec. 632.305 RSMo. The evidence will further show that at no time did [St. John's] seek to comply with the requirements of Sec. 632.305 RSMo. and as such involuntarily restrained plaintiff without voluntary consent."[3]

The trial court ruled that *Jacobs* did control and dismissed Windler's counterclaim. This appeal followed.

1. Pertinent portions of § 538.225, RSMo 1986, read, as follows:

"1. In any action against a health care provider for damages for personal injury ... on account of the rendering of or failure to render health care services, the plaintiff or his attorney shall file an affidavit with the court stating that he has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition."

2. As provided by Rule 74.01(b), the trial court found there was no just reason to delay an appeal of its order, thereby enabling the defendant to appeal from the order of dismissal.

3. Sections 632.300 through 632.475, RSMo 1986 & Supp.1988, describe the civil detention procedures to be followed when a "mental health coordinator" receives information alleging that a person, as the result of a mental disorder, presents a likelihood of serious physical harm to himself or others. "Mental health coordinator" is defined in § 632.005(10), RSMo Supp. 1988.

## DISCUSSION AND DECISION

Implicit in the wording of her counterclaim and in her written argument to the trial court is a recognition by Windler that St. John's was acting in its capacity as a health care provider when the alleged incident of unlawful imprisonment occurred. Neither before the trial court nor to this court does she argue otherwise.[4] Rather, she challenges the trial court's finding that *Jacobs* governs. In doing so she characterizes the dismissed counts in *Jacobs* as being clearly founded on negligence principles, and, hence, "were of the nature [that § 538.225.1] was intended to cover, i.e. allegations against a physician for personal injury as a result of the negligence of a physician specifically the breach of duty to provide such care as a reasonably prudent and careful health care provider would have provided under similar circumstances." She argues that she need not file the § 538.225.1 affidavit because her claim is distinguishable from those in *Jacobs* in that her counterclaim charges false imprisonment, an intentional tort. Continuing, Windler asserts that it is not an element of her case that she show a duty and a breach of the standard of care that a reasonably prudent and careful health care provider would have provided under similar circumstances, but, instead, all she needs to prove is that St. John's intentionally restrained her against her will.

We conclude that the foregoing argument flows from a misreading of *Jacobs*. In *Jacobs* plaintiff filed a multiple count petition naming a medical doctor and a registered nurse as defendants. In Counts I–IV, plaintiff sought damages from the physician on theories of tortious interference with contract, negligent infliction of emotional distress, negligence, and prima facie tort. In Count IX, the plaintiff sought damages from the nurse on a negligence theory. In Count V plaintiff sought injunctive relief against the physician. All counts were dismissed by the trial court because of plaintiff's failure to file the § 538.225.1 affidavit. The Eastern District affirmed the dismissal of Counts I–IV and IX, the damage counts, saying:

> The legal question is whether the gravamen of plaintiff's claims for damages consists of claims against Dr. Wolff and nurse Unser in their capacity as health care providers. Given the relationship of the parties and the true claim for damages relates to wrongful acts of a health care provider, we find § 538.225 RSMo 1986 applies regardless of the characterization of the claims by plaintiff.

*Jacobs,* 829 S.W.2d at 472[2].[5] The court then examined the various allegations of plaintiff's petition and concluded:

> The gravamen of all plaintiff's complaints, for which he seeks damages against Dr. Wolff and nurse Unser, are related to breaches of duty in rendering rehabilitative care. Plaintiff had no other relationship with Dr. Wolff or nurse Unser except for rehabilitation under the prescription of his cardiologist. Defendants' activities at the rehabilitative cen-

4. In her brief, Windler says:
   "On ... November 14, 1991 [sic 1990], the Defendant ... was transported to St. John's.... Defendant was not allowed to leave. Defendant was discharged after she was examined by Dr. Richard Christie who opined that she had not been suicidal and that continued detention of her would be more harmful than useful....
   On July 22, 1991 Plaintiff filed its Petition against Defendant for the medical cost of the hospitalization during the involuntary detention.
   On August 29, 1991 defendant filed her ... Counterclaim alleging that Plaintiff falsely imprisoned her on November 15, 1990...."
   Although such "facts" were outside the record, at oral argument counsel for both parties agreed they were true. Additionally, at oral argument, Windler's counsel acknowledged that while Windler was at St. John's the relationship between St. John's and Windler was that of health care provider and patient; that she was taken to St. John's for examination under the mental health statutes to determine whether she needed to be confined.

5. The *Jacobs* court held that the trial court erred in dismissing the count seeking injunctive relief. "[T]he statute [§ 538.225] is limited to actions 'against a health care provider for damages for personal injury or death.' A failure to file the statutory affidavit will not operate to support dismissal of a petition which does not seek damages." *Jacobs,* 829 S.W.2d at 473.

ter were related only to providing services to persons, including plaintiff, who required a form of health care.... On these facts § 538.225 applies.

829 S.W.2d at 473.

Under *Jacobs,* the elements of the cause of action do not fix conclusively whether the § 538.225.1 affidavit is required.[6] Instead, *Jacobs* teaches, if a court determines that the relationship of the parties is that of health care provider and recipient and that the "true claim" relates only to the provision of health care services, then the health care affidavit is mandatory.

Here, the trial court made the determination that the health care relationship existed and Windler does not challenge that finding.[7] Despite her characterization of her claim as false imprisonment, we conclude her "true claim" requires the affidavit, because the basis for the alleged false imprisonment was the incorrect—or totally absent—medical determination that she needed to be confined.[8]

■ Windler makes the additional argument that the § 538.225 affidavit requirement does not apply because her claim is not one for damages for *personal injury;* rather, it is a claim for damages for injury to her *personal rights. See, e.g., Signorino v. National Super Markets,* 782 S.W.2d 100, 104[4] (Mo.App.1989) (in assessing actual or general damages for false arrest a jury can properly consider such things as embarrassment, disgrace, humiliation, injury to plaintiff's feelings or reputation, and mental suffering); *see also Nelson v. R.H. Macy & Co.,* 434 S.W.2d 767, 774–75[8] (Mo.App.1968). As we interpret Windler's position, she would have us view the term "personal injury" in § 538.225.1 in a narrow sense, as a hurt or damage to her person, such as a cut or bruise or broken limb, as distinguished from an injury to her reputation, feelings, or similar "personal rights." *See Black's Law Dictionary* 786 (6th ed.1990). We reject Windler's view for the reasons which follow.

The term "personal injury" is chiefly used in its narrow sense in negligence actions and in worker's compensation cases. *Black's Law Dictionary* 786 (6th ed.1990). The term also is used in a much wider sense (usually in statutes) to include any injury which is an invasion of personal rights, and, in this sense, may include such injuries to the person as libel or slander, criminal conversation, malicious prosecution, *false imprisonment,* and mental suffering. *Id. See also Gray v. Wallace,* 319 S.W.2d 582, 583–85[2, 3] (Mo.1958); 43A C.J.S. Injury at 769 (1978).

6. Just as duty and breach of duty (negligence elements) are not elements in a false imprisonment case (such as here), they likewise are not elements in suit for tortious interference with contract or a prima facie tort action. *See Smith v. Lewis,* 669 S.W.2d 558, 562[5] (Mo.App.1983 (elements of false imprisonment action are detention or restraint of one against his or her will, and the unlawfulness of such detention or restraint; liability attaches where defendant instigated, caused or procured the arrest). *Compare Meyer v. Enoch,* 807 S.W.2d 156, 159 (Mo.App.1991) (*intentional* interference by defendant inducing or causing a breach of contract is an element of a tortious interference with contract action); *Porter v. Crawford & Co.,* 611 S.W.2d 265, 268 (Mo.App.1980) (*intentional* lawful act by defendant and an *intent to cause injury* are elements of prima facie tort case).

7. We need not decide whether, in the absence of a health care relationship, or if a health care relationship exists but other activities are involved, a claimant must file the affidavit. To illustrate, if Windler had alleged that while visiting in the hospital she had been unlawfully restrained or detained by employees of St. John's upon an unfounded accusation of theft, the result might be different. Likewise, if Windler had alleged that as a patient in the hospital she was ready for discharge but was unlawfully restrained or detained because of unfounded theft accusations, the affidavit may or may not be required. Not having those facts before us, we do not reach such questions.

8. At oral argument, Windler's attorney stated:

What we're complaining about is the fact that she didn't need to be there and she was held there. No determination was made as to whether or not she needed to be there until some time later....

[I]f [this] case goes to trial there would be some evidence as to whether she ever needed treatment to begin with.

. . . .

She was brought there [to St. John's] by somebody at Cox Hospital and it was with at least the intention, if not on her part on somebody's part, that she be examined under the health care statutes as to whether or not she needed to be confined.

In *Gray*, our supreme court recognized that the gist of an action for false imprisonment is injury to one's personal rights as distinguished from an injury to the person. 319 S.W.2d at 585[4]. When the *Gray* court examined the history of §§ 537.010–537.030, RSMo 1949 (statutes concerning abatement or survival of actions for personal injuries after death), it determined that the legislature intended that the term "personal injuries" be viewed "in its broadest and most comprehensive sense" and that the legislature intended that the term include "all actions for injuries to the person whether to the person's rights [as in a false imprisonment case] or to his body." 319 S.W.2d at 584[3].

Viewing Chapter 538 in the light of what was said in *Gray* convinces us that Windler's argument has no merit. In Chapter 538 the legislature authorized a trier of fact to award "non-economic damages" in an amount not to exceed $350,000 "[i]n any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services." §§ 538.210–538.215 RSMo 1986. "Non-economic damages" are defined as "damages arising from nonpecuniary harm including, *without limitation,* pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement, loss of capacity to enjoy life, and loss of consortium but shall not include punitive damages." § 538.205(7), RSMo 1986 (emphasis ours).

If we were construing § 538.225.1 alone and without reference to the other provisions of Chapter 538, it would be more difficult to determine whether the legislature intended the term "personal injuries" to be understood in the broad sense of damages for injuries to "personal rights" or in the more limited view of damages for injuries to the person such as from trauma or disease. However, the definition of "non-economic damages" in § 538.205(7) is broad. Such a broad definition of damages makes it clear that the legislature intended that the term "personal injuries" in Chapter 538 include all actions for injuries to the

person, whether to the person's rights or to the person's body. *See Gray,* 319 S.W.2d at 584. We hold that damages for "false imprisonment" are damages for "personal injury" within the meaning of § 538.225.1. Windler's argument to the contrary is rejected.

We affirm.

PARRISH, C.J., dissents in separate opinion.

CROW, P.J., concurs.

PARRISH, Chief Judge, dissenting.

I respectfully dissent.

The statute that the trial court relied upon in determining defendant Kelly Windler's (hereafter referred to as counterclaimant) counterclaim is § 538.225.1.[1] It states, as quoted in n. 1 in the majority opinion:

> In any action against a health care provider for damages for personal injury ... on account of the rendering of or failure to render health care services, the plaintiff or his attorney shall file an affidavit with the court stating that *he has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.* (Emphasis added.)

The language in § 538.225.1 is derived from the elements that must be proved to show that a medical practitioner was negligent. To prove negligence, a medical practitioner must be shown to have failed to use the degree of skill that an ordinarily skillful, careful and prudent practitioner in the same field would have used under the same or similar conditions and that there was a causal connection between the act or omission about which there was a complaint which resulted in injury (i.e. damage)

---

1. References to statutes are to RSMo 1986.

to a patient. *Fisher v. Wilkinson*, 382 S.W.2d 627, 630 (Mo.1964); *Jines v. Young*, 732 S.W.2d 938, 944 (Mo.App.1987).

The affidavit is a means by which a plaintiff, shortly after he or she has filed a lawsuit, demonstrates that there is substantial evidence of professional negligence—medical malpractice. The affidavit must be given by an expert, a person who is competent to testify about the subject matter that is before the court. By the affidavit, the expert states that the elements of negligence required in a medical malpractice case are present. Its purpose is to determine that the action filed is not frivolous. *Mahoney v. Doerhoff Surgical Services*, 807 S.W.2d 503, 507–08 (Mo. banc 1991).

A health care provider is competent to assess the conduct of another health care provider for the purpose of formulating a meaningful opinion regarding whether or not a particular act or omission that occurred in the course of providing medical care was done negligently and, if so, whether it "directly caused or directly contributed to cause the damages claimed in the petition" filed in a particular case. § 538.225.1.

The counterclaim in this case, however, is not an action for negligence. It is an action for false imprisonment. A medical expert is not qualified to opine whether particular acts constitute false imprisonment. That determination is outside a medical practitioner's area of expertise. There is no logical or legal reason for an affidavit such as is required by § 538.225.1 to be filed in an action for false imprisonment.

The majority opinion relies on *Jacobs v. Wolff*, 829 S.W.2d 470 (Mo.App.1992). The language in *Jacobs* is strong. It includes the statement:

> The legal question is whether the gravamen of plaintiff's claims for damages consists of claims against Dr. Wolff and nurse Unser in their capacity as health care providers. Given the relationship of the parties and the true claim for damages relates to wrongful acts of a health care provider, we find § 538.225 RSMo

1986 applies *regardless of the characterization of the claims by plaintiff.* (Emphasis added.)

*Id.* at 472. However, the language has meaning only with respect to the particular facts in that case. It should not blanket fact situations different from those in that case.

In *Jacobs*, the issue for determination was whether Vital Cardiac Laboratories, an organization that apparently administered cardiac rehabilitation programs prescribed by physicians who were not its employees, was a health care provider within the meaning of § 538.225. 829 S.W.2d at page 473. In so finding, the court referred to numerous allegations throughout pleadings that contained language regarding medical knowledge and duties. *Id.* at 472. The opinion in *Jacobs* does not, however, otherwise identify the nature of any of the causes of action pleaded other than one that the trial court had not dismissed for failure to file a § 538.225.1 affidavit—Count IX which was an action that sought an injunction.

I perceive the legal question in this case to be whether or not counterclaimant was voluntarily confined or was confined pursuant to the provisions of § 632.305. Its resolve involves no medical issue. It involves a legal issue only, notwithstanding that counterclaimant's claim for damages is against a health care provider. I would reverse the order dismissing the counterclaim and remand the case to the trial court.