Virginia Lee MORRISON, Personal Representative of the Estate of Grace Morrison, Plaintiff/Respondent,

v.

ST. LUKE'S HEALTH CORPORATION and G.D. Searle & Company, Defendants/Appellants.

Nos. 69094, 69122.

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 6, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 9, 1996.

Application to Transfer Denied
Oct. 22, 1996.

Ronald C. Willenbrock, Julie S. Paez, Amelung, Wulff and Willenbrock, St. Louis, for St. Luke's Health Corp.

Gerald T. Noce, Thomas M. Buckley, Evans and Dixon, St. Louis, for G.D. Searle.

Canice Timothy Rice, Jr., St. Louis, for respondent.

CRANDALL, Judge.

Defendants, St. Luke's Health Corporation and G.D. Searle and Company, appeal from the trial court's judgment, entered pursuant to a jury verdict, in favor of plaintiff, Grace Morrison,[1] in her action for bodily injuries sustained in a fall which occurred in a doctor's office. The jury awarded plaintiff $400,000.00 in damages and the trial court entered judgment accordingly. We affirm.

■■■ Defendants challenge the submissibility of the case. In reviewing the submissibility of a case, we view the evidence, together with the reasonable inferences arising therefrom, in the light most favorable to the plaintiff. *Harris v. Woolworth*, 824 S.W.2d 31, 32 (Mo.App.1991). Further, we disregard the defendant's evidence except as it may aid the plaintiff. *Id.* The plaintiff may prove essential facts by circumstantial evidence as long as the facts proved and the conclusions to be drawn are of such a nature and are so related to each other that the conclusions may be fairly inferred. *Id.*

The evidence, viewed in this light, established that defendant, St. Luke's Health Corporation (St.Luke's), owned and operated not only a medical practice specializing in internal medicine and cardiology but also the offices in which the practice was located. On March 24, 1992, at approximately 11:00 a.m., plaintiff and her sister, Virginia Morrison (sister), arrived at the medical offices for a scheduled appointment with one of the physicians employed by St. Luke's.

Plaintiff was 92 years of age. Although she had problems with her vision and osteoarthritis, she was active and in relatively good health otherwise. She lived with her sister and was able to care for her needs independently. She walked without the assistance of a cane or walker.

At the same time plaintiff arrived at the office, a sales representative from defendant, G.D. Searle & Company (Searle), a pharmaceutical company, was also visiting the office. She called at the office once or twice a month. She talked with a medical assistant employed by St. Luke's who was sitting behind a chest-high counter which enclosed the nurses' station. The sales representative stood next to the counter; the medical assistant sat at her desk, facing toward the counter. The sales representative placed her briefcase on the floor next to the counter, setting it at an angle to the wall so that it protruded into the hallway. After chatting for about 2 to 5 minutes, she went into a small room opposite the nurses' station to check on the supply of drug samples. The sales representative testified that, as she did so, she left the briefcase in the hallway for about 10 to 30 seconds.

Another medical assistant, who also worked at the office and was employed by St. Luke's, exited the nurses' station and walked toward the waiting room down the hallway in which the sales representative was standing. This medical assistant testified, however, that she did not see either the Searle sales representative or the briefcase as she traversed this corridor. She held open the

1. Virginia Lee Morrison, the personal representative of the estate of Grace Morrison, is substituted as the respondent on appeal in place of plaintiff, Grace Morrison, who died in January 1996.

waiting room door, which was located across from the nurses' station, for plaintiff and her sister to enter the office. She was going to escort them to the room with the scale to weigh them and then place each of them in an examining room.

The waiting room door opened onto a hallway which ran in front of the nurses' station. The hallway continued around the nurses' station into a second hallway which ran at a right angle to the first hallway and which led to examining rooms. The small supply room which the sales representative entered was off this second hallway, directly across from the nurses' station. The sales representative entered the room as plaintiff started down the second hallway. Plaintiff walked in front of her sister; the medical assistant who was escorting them walked behind plaintiff and to the right of plaintiff's sister.

As plaintiff followed the hallway around the nurses' station and started down the second hallway toward the examining rooms, she fell. The medical assistant following behind her testified that she was looking "directly at" plaintiff when she saw her falling "forward." The Searle sales representative stated that although she did not see plaintiff enter the office or trip over the briefcase, she did see plaintiff in the act of falling. She described plaintiff as being "in the air" and "in flight." Plaintiff landed on the floor about four feet up the hallway from the sales representative's briefcase. Immediately after plaintiff fell, the sales representative came out of the supply room and told plaintiff's sister that she shouldn't have left her briefcase on the floor in the hallway. She then picked up the briefcase and left the doctor's office. Neither the sister nor the medical assistant noticed the briefcase in the hallway prior to plaintiff's fall.

Plaintiff sustained fractures to her hip and arm. She was hospitalized and underwent surgery to her hip. Two to four days after the fall, she suffered a stroke. At the time of trial, she was in a nursing home and was incapable of resuming the independent lifestyle she had enjoyed before the fall. At no time after the fall was she able to make a coherent statement concerning the fall. She was unable to testify at trial.

Plaintiff brought the present action: Count I sought damages against St. Luke's as the owner of the premises for its failure to know of the "dangerous condition" of the briefcase in the hallway and to either remove it or warn plaintiff; Count II sought damages against Searle for the negligence of its agent in creating the "dangerous condition" by placing the briefcase in the hallway. After a trial, the jury found in favor of plaintiff and awarded damages in the amount of $400,-000.00. The jury assessed St. Luke's fault at 40 percent and Searle's fault at 60 percent. The trial court entered judgment in accordance with the jury verdict.

## SEARLE'S APPEAL

In its first point, Searle contends plaintiff failed to make a submissible case in that there was no evidence that the briefcase caused her to fall. It argues that no one saw her trip over the briefcase and that she never said she fell over the briefcase. It posits that because there was no direct evidence that she tripped over the briefcase, the jury engaged "in speculation and conjecture as to what caused plaintiff to fall."

█ To make a prima facie showing of causation, the plaintiff must show the defendant's negligent conduct more probably than not was a cause of the injury. *Heacox v. Robbins Educational Tours, Inc.*, 829 S.W.2d 600, 603 (Mo.App.1992). The defendant's negligence need not be the sole cause of the plaintiff's injury, but simply a cause or a contributing cause. *Id.*

█ Here, there was sufficient evidence from which the jury could have found that the briefcase was a cause of plaintiff's fall. The second hallway leading to the examining rooms was at a right angle to the first hallway leading from the waiting room. Both hallways ran next to the nurses' station, which was enclosed by a chest-high counter. Plaintiff had to walk around the nurses' station to get into the second hallway. The Searle sales representative placed the briefcase next to the counter on the floor of the second hallway. When plaintiff entered the first hallway from the waiting room, the layout of the hallways and the height of the

counter suggest that she would not have been able to see the briefcase from that vantage point. When she entered the second hallway, she would have come upon the briefcase shortly after rounding the corner of the nurses' station. She would have had little time to notice the presence of the briefcase on the floor in front of her.

In addition, the Searle sales representative admitted that she left the briefcase on the floor in the second hallway while she went into the supply room. The supply room was located in the general vicinity of where she placed the briefcase. The sales representative saw plaintiff falling in the area of the briefcase. She described plaintiff as being "in flight," a description which indicates that plaintiff did not just collapse to the ground, but rather that something propelled her through the air and to the floor. Plaintiff landed about four feet past the briefcase. The sales representative also stated that she shouldn't have left the briefcase on the floor.

Searle relies on *Heacox* to support its position that plaintiff failed to establish the essential element of causation. In *Heacox*, 829 S.W.2d at 601, the plaintiff was an elderly woman who fell while ascending an asphalt pathway on the St. Louis riverfront. She brought an action against the company which arranged the tour to the riverfront for its failure either to provide an escort or to warn her of the danger of the steep incline. *Id.* at 602. A bus driver testified that the slope would be steep for someone elderly or heavy; and the plaintiff testified that she did not see any debris or trash on the pathway and she did not know what caused her to fall "other than [the pathway] was really steep." *Id.* The court noted that "[t]here was no evidence in [the] plaintiff's case showing the degree of the incline nor is there any other standard for the jury to use to evaluate sensibly the testimony of the plaintiff and the bus driver." *Id.* at 603. The court found that neither the plaintiff's testimony nor that of the bus driver made a prima facie showing that the degree of the incline more probably than not caused her to fall; how and why she fell was nothing more than speculation and conjecture. *Id.*

In contrast to *Heacox*, the evidence in the present action was that there was an object in plaintiff's path; namely, the briefcase. Further, unlike the *Heacox* plaintiff, whom the court found needed to present evidence of standards for degrees of inclines from which the jury could determine if the steepness of the slope was a cause of the plaintiff's fall, it was not necessary for plaintiff to present standards to establish whether the placement of the briefcase in a hallway of a doctor's office which was used by patients constituted a dangerous condition. Such knowledge was within the understanding of the lay person.

In addition, Searle offers other possible explanations as to how or why plaintiff fell, most of which are related to plaintiff's age and medical condition. Despite plaintiff's advanced age and medical problems, there was sufficient evidence to establish that the placement of the briefcase more probably than not was *a* cause of plaintiff's fall. It was not necessary that plaintiff prove either that the placement of the briefcase was the sole cause of her fall or concomitantly that other factors, such as poor eyesight or osteoarthritis, were not contributing factors to the fall.

Finally, in response to Searle's argument that plaintiff never told anyone she tripped over the briefcase, we are mindful of the language regarding the plight of fall victims contained in *Sheil v. T.G. & Y. Stores Co.*, 781 S.W.2d 778, 782 (Mo.banc 1989): "An injured [party] is often at a decided disadvantage in determining what has happened. The fall victim may be dazed, helpless …, unable to interview bystanders or to observe the scene carefully." These observations are especially meaningful when dealing with a plaintiff who is 92 years of age and has some physical limitations. Moreover, given the fact that plaintiff was not mentally coherent after the fall, it was onerous for Searle to question causation on the basis of her failure to state she fell over the briefcase.

There was sufficient evidence and inferences therefrom from which the jury could have found that the placement of the briefcase caused plaintiff to fall. Searle's first point is denied.

■ In its second point, Searle contends the trial court erred in refusing to direct a verdict in its favor because the briefcase was an open and obvious danger which plaintiff could have avoided.

*Searle cites to Harris v. Niehaus,* 857 S.W.2d 222, 226 (Mo.banc 1993) for the proposition that a landowner is entitled to expect its invitees' to exercise ordinary perception, intelligence, and judgment; to discover the obvious condition; to appreciate the risk presented; and to take the steps necessary to avert a tragedy. The *Harris* case, however, is not controlling. Searle is not a landowner and its liability is not predicated on its status as the owner and/or occupier of the land. Searle's second point is denied.

## ST. LUKE'S APPEAL

In its first point, St. Luke's challenges the submissibility of plaintiff's case, arguing that plaintiff failed to establish the essential element of St. Luke's actual or constructive knowledge of the dangerous condition of the placement of the briefcase in the hallway.

■ The general duty owed to an invitee by the owner of the premises is the exercise of reasonable and ordinary care in making the premises safe. *Luthy v. Denny's, Inc.,* 782 S.W.2d 661, 662 (Mo.App. 1989). The elements of a cause of action for an injured invitee are: (1) a dangerous condition existing on the floor of the defendant's premises which involved an unreasonable risk; (2) the defendant knew or by using ordinary care should have known of the condition; (3) the defendant failed to use ordinary care in removing or warning of the danger; and (4) as a result the plaintiff sustained injuries. *Id.* at 662–663. The plaintiff must show that the instrumentality which caused the injury was either inherently dangerous and/or defective or that it was placed in such a way that it created a dangerous condition. *Id.* at 663. The defendant must use reasonable care toward the plaintiff; what is reasonable depends upon the nature and the circumstances of the business. *Head v. National Super Markets, Inc.,* 902 S.W.2d 305, 308 (Mo.App. E.D.1995).

In *Sheil,* 781 S.W.2d at 780, the Missouri Supreme Court held that a plaintiff could make a submissible slip and fall case against a store owner without showing that the dangerous condition existed for a certain length of time. Noting that the store's self-service method of merchandising resulted in goods being moved about the store by customers, the court found that the box in the aisle on which the plaintiff fell was a "dangerous, foreseeable condition" against which the store had a duty to protect its customers. *Id.* at 781.

In the companion case to *Sheil, Moss v. National Super Markets, Inc.,* 781 S.W.2d 784, 785 (Mo.banc 1989), the plaintiff slipped on some liquid in the parking lot of a grocery store. The court held that the plaintiff made a submissible case against the business if the business' method of operation showed that its employees were regularly in the area in which the accident occurred. *Id.* at 786.

In *Head,* 902 S.W.2d at 308, the item on which the plaintiff slipped was located in the area of the grocery store between the aisle and the check-out lanes, an area where employees had an opportunity to observe it. In addition, there were employees charged with the duty of checking for foreign substances on the floor, although none was working at the time of the accident. *Id.* This court found that based upon this evidence and evidence regarding the store's method of operation, it was not necessary for the plaintiff to prove the length of time the item remained on the floor to establish that the store had notice. *Id.*

■ Although the case before us does not involve a grocery store or the application of the merchandising theory, the abrogation of the importance attached to the length of time a dangerous condition remained on the floor is not limited to cases involving grocery stores. In the present action, the length of time the briefcase was in the hallway was not the determining factor in plaintiff's making a submissible slip and fall case. Time was unimportant in the context of this case, because the issue here is whether the medical assistant should have seen the briefcase when she was accompanying plaintiff down the hallway toward the examining rooms.

Thus, the important factors were the method in which the medical office operated and whether the staff of the office was in the area and had the opportunity to observe the briefcase in the hallway.

Here, the medical assistant went to the waiting room for the purpose of escorting plaintiff down the hallway to the examining rooms. This was the usual procedure for bringing patients into the office for their appointments. Unlike the cases in which the plaintiffs fell in self-service grocery stores, this case involved an employee of St. Luke's escorting plaintiff into the area where the dangerous condition existed.

In order to get to the examining rooms, it was necessary for both plaintiff and the medical assistant to walk down the hallway in which the briefcase was placed. The briefcase was in plain view in the hallway. There was no evidence that the medical assistant's view of the briefcase was obstructed. There was no evidence that plaintiff rushed down the hallway ahead of the medical assistant before the medical assistant had the opportunity either to assist her or to notice the presence of the briefcase. Despite the medical assistant's testimony that she did not see the briefcase in the hallway prior to plaintiff's fall, the jury reasonably could have concluded that by using ordinary care the medical assistant should have seen the briefcase placed in the hallway directly in the path of plaintiff. Thus, St. Luke's is charged with knowledge of the presence of the briefcase in the hallway, an essential element of a slip and fall case. St. Luke's first point is denied.

In its second point, St. Luke's asserts plaintiff failed to make a submissible case because she failed to establish causation. This point was addressed and answered under point one of Searle's appeal. Accordingly, St. Luke's second point is denied.

In its third point, St. Luke's challenges the submissibility of plaintiff's case on the ground that the dangerous condition of the placement of the briefcase in the hallway was an open and obvious danger which plaintiff should have recognized and avoided.

■■■ St. Luke's cites to *Harris*, 857 S.W.2d at 226, to support its position that Restatement (Second) of Torts, § 343 (1965) bars plaintiff's recovery. Section 343 of the Restatement holds the possessor of land liable for injuries to an invitee because of a condition on the land only if the possessor "should expect that [invitees] will not discover or realize the danger or will fail to protect themselves against it...." *Id.* Possessors of land are not absolute insurers of the well-being of their invitees. *Id.* Failure to protect invitees against open and obvious dangerous conditions does not constitute a breach of the standard of care owed to invitees by possessors of land. *Id.* Comments b of § 343A((1) defines "obvious" as the situation when "both the condition and the risk are apparent to and would be recognized by a reasonable man ... exercising ordinary perception, intelligence, and judgment.)" § 343A Restatement (Second) of Torts, cmt. b (1965).

In *Harris*, the parents of children who drowned when their mother's unattended vehicle rolled down a sloping road into a lake brought an action against the trustees of the subdivision in which the road was located for failing to warn or protect the children from the dangerous slope leading to the lake. *Id.* at 224–225. The court held that the parents did not make a submissible case against the subdivision trustees, because the slope of the road was an open and obvious condition which presented risks the mother should have appreciated and taken steps to avoid. *Id.* at 227.

■■■ In the instant action, we cannot say as a matter of law that the dangerous condition of the placement of the briefcase in the hallway was open and obvious to plaintiff. There was no evidence that plaintiff could have known of the placement of the briefcase in the hallway and thus appreciated the risk it presented. Unlike the slope of the road in *Harris*, the placement of the briefcase was not a condition which plaintiff could readily observe. To the contrary, the placement of the briefcase was such that plaintiff was unable to see it until she rounded the corner of the nurses' station and entered the second hallway. At that point, she was only a few steps away from the briefcase. Further-

more, plaintiff was an elderly women with vision problems. The jury reasonably could have concluded that based upon plaintiff's advanced age and attendant physical problems, her powers of observation were different from those of the medical assistant who was escorting her down the hallway. Given the facts of this case, St. Luke's could not reasonably anticipate that plaintiff would recognize and protect herself from the danger of the briefcase in the hallway. We therefore cannot say as a matter of law that the condition was open and obvious. Rather, that issue was a question for the jury's resolution.

The obviousness of the danger of the placement of the briefcase was a factor for the jury to consider in assessing plaintiff's comparative fault. *See, e.g., Williams v. Junior College District of Cent. Southwest Missouri,* 906 S.W.2d 400 (Mo.App. S.D. 1995) (obviousness of danger of liquid on the floor of shop class was not open and obvious as a matter of law, but was a factor for the jury to consider in assessing student's fault). Here, based upon the evidence before it, the jury assessed plaintiff's fault at zero percent. St. Luke's third point is denied.

In its final point, St. Luke's charges error in the trial court's permitting plaintiff to proceed to trial without filing the requisite affidavits under § 538.225.1, RSMo(1994). That statute requires in pertinent part:

> In any action against a health care provider for damages for personal injury ... on account of the rendering of ... health care services, the plaintiff ... shall file an affidavit with the court stating that he has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances....

■ The purpose of § 538.225.1 is to eliminate at the early stages of litigation medical malpractice actions against health care providers which lack the color of merit and to protect the public against the costs of ungrounded medical malpractice claims. *Mahoney v. Doerhoff Surgical Services,* 807 S.W.2d 503, 507 (Mo.banc 1991). The affida-

vit requirement recognizes that the nature of the allegations of negligence in a medical malpractice action are such that expert medical testimony is required to prove the acceptable standard of professional care; and without expert opinion, the issue of breach of that standard of care cannot be made. *Id.*

St. Luke's relies on *St. John's Regional Health Center, Inc. v. Windler,* 847 S.W.2d 168 (Mo.App.1993) and *Jacobs v. Wolff,* 829 S.W.2d 470 (Mo.App.1992) to support its position that an affidavit was required in the present action. In *Windler,* the issue was whether it was necessary for the plaintiff to file a health care affidavit in conformity with § 538.225.1 in an action characterized by the plaintiff as a false imprisonment action. *Windler,* 847 S.W.2d at 169. The court concluded that despite the fact that the plaintiff's claim against the hospital was couched in terms of an intentional tort, the plaintiff's "true claim" required an affidavit because the basis of the alleged false imprisonment was the incorrect or totally absent medical determination that she needed to be confined. *Id.* at 171. Thus, the plaintiff's claim was against the hospital in its capacity as a health care provider. *Id.*

In *Jacobs,* the issue was whether the plaintiff's claims for damages against a physician and nurse for tortious interference with contract, negligent infliction of emotional stress, negligence, and prima facie tort were in essence claims based on whether the physician and nurse were acting as health care providers. *Jacobs,* 829 S.W.2d at 472. The court found that the action arose solely as a result of the physician's and nurse's alleged breaches of duty to the plaintiff in rendering him rehabilitation after cardiac bypass surgery. *Id.* at 473. The court thus concluded that the true claim for damages related to the wrongful acts of a health care provider and that an affidavit was a prerequisite to plaintiff's action for damages. *Id.*

■ St. Luke's reliance on these cases is misplaced. When plaintiff fell her status was that of an invitee and St. Luke's status was that of an owner and/or occupier of the premises on which plaintiff was injured. There was no need for expert testimony to establish

the standard of care of a professional health care provider, because St. Luke's was not functioning in that capacity when plaintiff sustained injury as a result of a fall over the briefcase. The cases requiring a health care affidavit, including *Windler* and *Jacobs,* involve instances of the alleged negligence of a health care provider where the health care provider was acting in that capacity and where it was essential that the plaintiff establish by expert testimony that the health care provider deviated from the accepted standard of care. *See, e.g., Vitale v. Sandow,* 912 S.W.2d 121 (Mo.App. W.D.1995) (patient's claim against physician for sending letter to patient's employer intimating that patient was malingering related to proper diagnosis). The present action was not a medical malpractice action, the type of case clearly addressed by § 538.225.1. It was not necessary for plaintiff to file an affidavit pursuant to that statute. St. Luke's fourth point is denied.

The judgment of the trial court is affirmed.

DOWD, J, concurs in opinion of CRANDALL, J.

CRAHAN, P.J., dissents and files separate opinion.

CRAHAN, Presiding Judge, dissenting.

I respectfully dissent. At most, the majority opinion establishes that the briefcase *could* have caused Plaintiff's fall. Defendants concede that much. Whether it did cause or contribute to cause the fall is sheer speculation. Further, assuming *arguendo* that the briefcase played some role in the fall, Plaintiff failed to make a submissible case of premises liability against St. Luke's.

The briefcase in question is a rectangular, brown leather soft-sided satchel, sixteen inches long, five inches wide at the base and twelve to fifteen inches high, depending on whether the handles are extended. When filled as it was on the date in question, it weighs six or seven pounds. The Searle representative had placed it adjacent to and at an angle from a partition while she was speaking with an office worker seated at a desk on the other side of the partition. At that location, the hallway formed by the partition and opposite wall is 47.5 inches wide. After conversing for a couple of minutes, she stepped across the hallway into an alcove for more than 15 but less than 30 seconds to check on the office's supply of samples, leaving the briefcase next to the partition.

The Searle representative never saw Plaintiff until she was falling forward past the doorway to the alcove. The office worker, who was then standing, saw Plaintiff begin to fall when she was about five feet away from her and rushed forward to try to catch her head.

Although it is abundantly clear that the fall occurred in the general vicinity of the briefcase, no one saw or heard Plaintiff's foot come into contact with it. After the fall, the briefcase was still upright and there was no evidence that it had moved. There is no evidence that Plaintiff herself ever told anyone that she had tripped over the briefcase. Her sister testified that Plaintiff was conscious and lucid after the accident and after admission to the hospital but Plaintiff never told her she tripped over the briefcase and her sister never asked her.

Plaintiff's sister testified that after the accident, the Searle representative picked up a briefcase and said she "shouldn't have left it there." Although the Searle representative denied making such a statement, we must assume she did so in evaluating the submissibility of Plaintiff's case. At best, however, the statement if made could only represent conjecture and surmise because the Searle representative did not see what caused Plaintiff to fall.

Defendants concede that Plaintiff *could* have tripped over the briefcase. What is missing is any evidence that the briefcase was more probably the cause of her fall than some other cause. Plaintiff was 92 years of age when she fell. Plaintiff's expert, Dr. Eyerman,[1] agreed that studies have shown that 30% of people over 65 years of age fall each year, as do 40% of people over 80. Further, Plaintiff had a history of falling.

---

1. Dr. Eyerman did not render an opinion on the cause of the fall. The focus of Dr. Eyerman's testimony was the degree of the injury attributable to the fall.

Her home health certification plan specifically noted "frequent falls" and a number of specific instances were recounted by her sister and/or her medical records. Dr. Eyerman further conceded that plaintiff's arthritis could have made her more prone to fall; one of her medications, Lanoxin, could cause a fall; or Plaintiff could have fallen for no reason.

Contrary to the majority's analysis, *Heacox v. Robbins Educational Tours, Inc.*, 829 S.W.2d 600 (Mo.App.1992), is directly on point. Although it is true that *Heacox* also involved an issue as to the sufficiency of plaintiff's evidence to establish the angle of the incline as a dangerous condition, the dispositive issue in that case, as in this case, was proximate cause, as revealed in the following passage:

> More important, perhaps, plaintiff did not make a prima facie showing that the degree of the incline caused her to fall, even if the incline were in fact an unreasonable risk to her. The traditional and most often used test for cause is the "but for test": a defendant's negligence is a cause of an injury where the injury would not have occurred *but for* defendant's negligent conduct. *E.g. Delisi v. St. Luke's Episcopal–Presbyterian Hospital, Inc.*, 701 S.W.2d 170, 175 (Mo.App.1985). Defendant's negligence need not be the sole cause but simply *a* cause or a contributing cause. To make a prima facie showing of cause, however, the plaintiff must show defendant's negligent conduct more probably than not was a cause of the injury. *Morgan v. Toomey*, 719 S.W.2d 129, 131 (Mo.App.1986). Obviously, the fact that plaintiff fell on the pathway does not show the incline of the pathway more probably

than not caused her to fall. It is guesswork where the greater probabilities lie.

The bus driver's testimony that the incline "would be a steep slope for someone heavy or [for] an elderly lady" does not reasonably imply the incline would cause heavy or old people to fall. The more sensible or, certainly, equally sensible implication is that heavy or old people would find it tiring to walk up the incline. But, a prima facie showing of cause is not made where the operative facts, at best, support two equal inferences, only one of which would make the defendant liable. *E.g. Cato v. Modglin*, 545 S.W.2d 307, 311 (Mo. App.1976).

Moreover, on direct examination, plaintiff candidly admitted she does not know what caused her to fall "other than ... [the pathway] was ... really steep." This is not a statement of an operative fact showing cause. Here again, we liberally view the legitimacy of inferences in plaintiff's favor. But, at best, her statement is only a guess as to the cause of her fall. How and why plaintiff fell, on this record, is nothing more than speculation and conjecture, and speculation and conjecture do not constitute a prima facie showing of cause. *See e.g. Craddock v. Greenberg Mercantile*, 297 S.W.2d 541, 547–548 (Mo. 1957).

829 S.W.2d at 603. Likewise in this case, nobody knows what caused Plaintiff to fall. Whether it was the briefcase, dizziness, arthritis, old age, or simply tripping over her own two feet is pure guesswork.[2] Such guesswork does not support a finding of proximate cause.[3] Accordingly, I would re-

---

**2.** It is not clear whether the majority views the manner in which Plaintiff fell (*e.g.*, op. at p. 902: "She described Plaintiff as being 'in flight' a description which indicates Plaintiff did not simply collapse to the ground, but rather something propelled her through the air and to the floor.") as significant to the holding but there is no evidence that the manner in which Plaintiff fell would have been different if she had simply tripped over her own feet. At best, the manner in which she fell tends to rule out fainting but there is no evidence that it was not consistent with the other possible causes identified in the evidence and I do not see how we can judicially notice how people fall under different circum-

stances. Further, the fact that the briefcase didn't tip over and the absence of any evidence that it had even been disturbed suggest that it could not have "propelled her through the air."

**3.** Contrary to the majority's analysis, nothing in *Sheil v. T.G. & Y. Stores*, 781 S.W.2d 778, 782 (Mo. banc 1989), purports in any way to relax the plaintiff's burden of establishing causation. *See* op. at p. 902. In *Sheil*, what caused the fall was not in issue. What was at issue was who placed the box in the aisle and whether the store could be deemed to have *notice* of it. 781 S.W.2d at 780–82. It was in that context—*i.e.*, proving *notice*, that the court suggested that the

verse the judgment against both Defendants on that basis.

Assuming *arguendo* that the jury could properly infer that the briefcase caused Plaintiff to fall, I would further hold that Plaintiff failed to establish that either defendant breached any duty of care to Plaintiff by allowing the briefcase to remain unattended in a hallway for a period of 15 to 30 seconds.

As described above, the briefcase in question is a relatively large object. It was sitting in a well-lighted area next to a white wall on a gray carpet. There was ample room to simply walk around it. As Plaintiff proceeded from the waiting room into the office, she walked past an angled partition approximately four feet high. At that point, the partition angled away again to the left (not at a right angle) to form the corridor in which Plaintiff fell. The briefcase was situated several feet down this corridor on the left. From the photographs in evidence, the distance from the angled partition at the beginning of the corridor to the briefcase appears to be three to four feet. Any average person looking where they were walking could easily spot the briefcase and have ample room to adjust their path to the right in time to avoid the briefcase.

Although the more prudent course of action would have been to carry the briefcase into the alcove with her for the few seconds she was in there, the object is sufficiently large and visible that the Searle representative could readily expect that anyone walking down the corridor would see the briefcase and simply walk around it. Although the "open and obvious" exception of *Harris v. Niehaus,* 857 S.W.2d 222, 226 (Mo. banc 1993) has generally been applied in landowner liability cases, I see no reason why it should not be equally available to Searle. If a landowner, who by law owes an affirmative duty to invitees, cannot be held liable for

failure to repair or warn of an open and obvious danger, *a fortiorari* one who is under no special duty likewise should be entitled to assume that others will take steps to avoid open and obvious hazards.

As for St. Luke's, who was the landowner in this case, there is no basis for a finding of actual or constructive notice. Nor did St. Luke's have any duty to warn of the presence of the briefcase if it had notice because the "dangerous condition" presented by the briefcase was open and obvious.

Short of stationing corridor police or hall monitors in every corridor, it is difficult to see how St. Luke's could possibly have done anything more than it did to avoid this accident. There was no evidence that any employee of St. Luke's ever saw the briefcase prior to the accident. Under the most generous view of the record, the briefcase was sitting unattended in the corridor for, at most, 30 seconds.[4] There was evidence that the medical assistant who opened the door for Plaintiff and her sister may have walked past the Searle representative standing at the partition but she had no recollection of seeing either her or the briefcase. Assuming she did walk past the Searle representative while she was standing at the partition, this would not impart constructive notice to St. Luke's because at that point, the briefcase presented no danger to anyone. Briefcases, like purses, are highly personal accessories that are not generally left unattended for any substantial length of time. The Searle representative testified that while she was standing at the partition the briefcase was next to her right foot. So long as she remained there, the briefcase presented no danger. Assuming the medical assistant should have seen the Searle representative and her briefcase, there was no need for her to take any action because she was entitled to assume that if the Searle representative

---

dazed or helpless condition of the victim might be taken into account in weighing submissibility.

**4.** Although *Sheil* and *Moss v. National Super Markets, Inc.,* 781 S.W.2d 784, 785 (Mo. banc 1989) do indicate that a submissible case can be made without showing that the dangerous condition existed for a certain length of time, it does

not follow that a submissible case is made where plaintiff's evidence establishes that the length of time is very short. In *Elmore v. Wal–Mart Stores,* 812 S.W.2d 178, 182 (Mo.App.1991), we held that proof that a package of mints not sold at the store were on the floor less than 5 minutes precluded a finding of constructive notice as a matter of law.

 

moved somewhere else, she would take the briefcase with her.[5]

The majority finds constructive notice by stating that the issue is whether the medical assistant should have seen the briefcase as she was accompanying Plaintiff down the hallway toward the examining rooms. Op. at p. 903. The majority then observes that the briefcase was in plain view and that "there was no evidence that the medical assistant's view of the briefcase was obstructed." Op. at p. 904. The latter observation is inaccurate. As the majority acknowledges in its recitation of the facts, Plaintiff was walking in front of her sister and the medical assistant was behind Plaintiff and to the right of her sister. Op. at p. 901. Plaintiff's sister testified that Plaintiff was walking on the left side of the corridor, next to the partition. Therefore, as Plaintiff turned past the angle of the partition and proceeded toward the briefcase, she would have been directly between the medical assistant and the briefcase.

The majority further observes that the height of the partition and the layout of the hallway suggest that the briefcase would not have been visible to Plaintiff until she rounded the angled portion of the partition and then would have had little time to notice the briefcase. If this is so, and in view of the fact that the alignment of Plaintiff, her sister and the medical assistant would have placed Plaintiff between the medical assistant and the briefcase as she rounded the corner, there is no basis for imputing constructive notice of the danger presented by the briefcase to either the medical assistant or St. Luke's. The majority cannot have it both ways. If the briefcase was in a position that Plaintiff could not have observed it and appreciated the danger in time to avoid it (op. at p. 904) neither could someone walking a couple of feet behind her. Nor can St. Luke's duty be predicated on Plaintiff's advanced age and allegedly more limited powers of observation. Op. at p. 905. As the majority acknowledges elsewhere in its opinion, the Restatement provision adopted and applied in *Harris* employs the "reasonable man" standard. A landowner has no duty to warn of dangers where "both the condition and the risk are apparent to and would be recognized *by a reasonable man ... exercising ordinary perception, intelligence, and judgment.*" Op. at p. 904, quoting Restatement (Second) of Torts, § 343A, cmt.b (1965) (emphasis added). *See also Harris,* 857 S.W.2d at 226. In any event, absent actual or constructive notice, there is no liability on the part of St. Luke's regardless of whether the danger presented by the briefcase was open and obvious.

For the foregoing reasons, I would reverse the judgments against both Defendants.

---

5. From the time estimates in the record as to how long it took the medical assistant to walk to the door to admit Plaintiff and her sister and how long the briefcase was left unattended, it does not appear possible that the medical assistant walked down the corridor while the briefcase was unattended.