The DOE RUN RESOURCES COR-
PORATION, Respondent/Cross–
Appellant,

v.

CERTAIN UNDERWRITERS AT
LLOYD'S LONDON, et al., Ap-
pellant/Cross–Respondent.

No. ED 98086.

Missouri Court of Appeals,
Eastern District,
Division Three.

April 16, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied May
23, 2013.

Application for Transfer Denied
June 25, 2013.

Bruce David Ryder, St. Louis, MO, for appellant.

Thomas P. Hohenstein, St. Louis, MO, Vincent H. Herron, Los Angeles, CA, Anthony J. Matera, Marc D. Halpern, San Diego, CA, for respondent.

Before ROBERT G. DOWD, JR., P.J., ROY L. RICHTER, J., and ANGELA T. QUIGLESS, J.

## *OPINION*

PER CURIAM.

The underlying lawsuit was brought by Respondent/Cross–Appellant The Doe Run Resources Corporation (Doe Run) seeking coverage for environmental remediation costs under seven excess insurance policies issued by Appellant/Cross–Respondent Certain Underwriters at Lloyd's London et al. (LMI).

At the crux of this case is a choice of law issue—whether Missouri or New York law applies. Doe Run argued that Missouri law governed the policies providing coverage from 1952 to 1961. The trial court ruled in favor of LMI finding New York law applied. In a July 14, 2011 written order and also during the jury instruction

conference, the trial court entered summary judgment in favor of LMI finding, pursuant to New York law, 1) the insurance policies covering the period of 1958 to 1961 did not provide coverage for three sites whose mills were inactive during that period, 2) Doe Run's damages would be allocated pro rata over the entire period during which the contamination migrated from each site, and 3) there could be no more than one occurrence per site and per policy period.

After a seven-day trial, the jury returned a verdict for Doe Run, finding LMI liable for coverage under all seven policies. The jury determined Doe Run spent $62,481,238.30 in remediation costs. Because of the trial court's previous rulings that New York law applied, the court allocated Doe Run's losses on a pro rata basis and over the entire period during which active pollution and passive migration of contaminants occurred. As a result, the final judgment issued by the court was $5,145,208.03, less than ten percent of the damages found by the jury. Both parties appealed.

Because Missouri law applies, the judgment is affirmed in part, and reversed and remanded with instructions to reinstate the full amount of the jury verdict.

## I. BACKGROUND

Doe Run is a mining, milling, and smelting company originally incorporated in the late 1800's to mine 946 acres of land located in St. Francois County, Missouri.[1] Doe Run operated mining and milling sites in Missouri's Old Lead Belt, and built a lead smelter plant in Herculaneum, Missouri to smelt the lead from its mines.

Doe Run's operations and milling procedures generated lead-containing wastes called "chat piles" and "tailings ponds" that were deposited on each of the six sites at issue.[2] The United States Environmental Protection Agency (EPA) determined that wind and water erosion caused lead and other minerals in the chat piles and tailings ponds to continually migrate from the mill sites and damage neighboring properties. The EPA held Doe Run liable for the waste and required it to investigate and remediate those areas around the mill site. Among the remedial actions required, the EPA required Doe Run to remove or cap impacted soil and stabilize chat piles and tailings ponds to prevent offsite migration.

### Insurance Policies

After the EPA issued administrative orders for remedial actions, Doe Run sought coverage for its environmental response actions from LMI. LMI sold Doe Run seven excess insurance policies covering 1952–1961. The policies were purchased in three-year increments, and each period was covered by multiple policies. In 1952, LMI issued two policies with a policy period of August 1, 1952, to August 1, 1955. In 1955, LMI issued three policies with a policy period of August 1, 1955, to August 1, 1958. The 1952 and 1955 policies provided coverage for damages and expenses because of injury to or destruction of property as a consequence of a covered occurrence that happened during the respective policy periods. The policy defined "occurrence" as an "unexpected event or happen-

---

1. Doe Run is the successor to St. Joseph Lead Company, which changed its name to St. Joe Minerals Corporation in approximately 1970. In 1981, St. Joe Minerals Corporation merged into Fluor Acquisition Corporation, which changed its name to The Doe Run Resources Corporation in approximately 1994.

2. This appeal involves six sites that are owned and/or operated by Doe Run: Leadwood, Bonne Terre, Elvins, National, Desloge/Big River, and Federal.

ing which results in personal injury or damage to property during the policy period, provided the assured did not intend or anticipate that injury or damage would result." In 1958, LMI issued Doe Run two policies with a policy period of August 1, 1958, to August 1, 1961. These policies defined occurrence as "one happening or series of happenings, arising out of, or due to one event taking place during the term of this policy."

### Doe Run's Demand for Coverage

On December 11, 2006, Doe Run's counsel sent a letter to LMI's counsel formally tendering the EPA administrative claim for cleanup of the Leadwood site. LMI did not respond to the letter, and Doe Run sued LMI for coverage.[3]

Prior to trial, the parties filed a myriad of motions for summary judgment. The court granted LMI's motion that limited the extent of coverage Doe Run could receive, finding that New York law governed each insurance policy which allocated Doe Run's losses on a pro rata basis and over the entire period during which active pollution and passive migration of contaminants occurred. The trial court also granted partial summary judgment for LMI as to the extent of coverage of three sites under the 1958 policies. The trial court found that there was no coverage for three of the six mining sites—Desloge, Elvins, and National—as a matter of law because said sites were inoperative between 1958 and 1961.

Phase I of the litigation went to trial on August 22, 2011. At the close of Doe Run's evidence, the trial court denied LMI's written motion for directed verdict. After the seven-day trial, LMI orally renewed its motion for directed verdict, and the court denied it. At the jury instruction conference, the trial court clarified its previous ruling on motion for summary judgment and ruled that there could be no more than one occurrence at each site per policy period. Despite the previous rulings, the jury received a special verdict form with separate blanks for the periods of contamination at each of the six sites from each of the three alleged causes. The jury found LMI liable for coverage under all policies for each of the six sites and awarded Doe Run $62,481,238.30 in environmental response costs. The jury's findings are reflected on the following chart as presented by Doe Run:

| Verdict–Site | Period of Contamination | Total Remediation Costs |
|---|---|---|
| **Verdict A–Big River/Desloge** | | |
| Surrounding Areas | 1929–2011 | $ 1,252,842.00 |
| Chat Pile | 1929–2011 | $ 2,790,906.00 |
| Tailings Pond | 1932–2011 | $ 5,581,812.12 |
| **Verdict B–Bonne Terre** | | |
| Surrounding Areas | 1916–2011 | $ 3,062,503.00 |
| Chat Pile | 1916–2011 | $ 4,660,549.67 |
| Tailings Pond | 1932–2011 | $ 2,330,274.83 |
| **Verdict C–Elvins** | | |
| Surrounding Areas | 1936–2011 | $ 1,849,148.00 |
| Chat Pile | 1936–2011 | $ 4,062,053.85 |

**3.** At the time of its original petition, Doe Run was only aware of the 1958–1961 insurance policies with LMI that covered one site. After discovering the additional policies, Doe Run filed the amended petition to add the policies that covered additional sites.

| | | |
|---|---|---|
| Tailings Pond | 1936–2011 | $ 4,062,053.85 |
| **Verdict D–Federal** | | |
| Surrounding Areas | 1923–2011 | $ 462,500.00 |
| Chat Pile | 1923–2011 | $ 1,213,821.83 |
| Tailings Pond | 1932–2011 | $ 606,910.91 |
| **Verdict E–Leadwood** | | |
| Surrounding Areas | 1894–2011 | $ 4,000,000.00 |
| Chat Pile | 1894–2011 | $ 5,148,145.00 |
| Tailings Pond | 1932–2011 | $10,296,290.00 |
| **Verdict F–National** | | |
| Surrounding Areas | 1936–2011 | $ 2,179,838.00 |
| Chat Pile | 1936–2011 | $ 5,947,726.47 |
| Tailings Pond | 1936–2011 | $ 2,973,863.24 |

The jury also found that LMI refused or failed to pay Doe Run without reasonable cause or excuse for each of the sites and assessed the maximum possible ten percent penalty against LMI and awarded Doe Run attorney's fees. Notwithstanding the $62,481,238.30 verdict, the court awarded $5,145,208.03 in damages as a result of the previous rulings. LMI appealed, and Doe Run cross-appealed.

LMI raises two points on appeal. In its first point, LMI alleges the trial court erred in denying its motion for directed verdict at the close of all the evidence because Doe Run failed to make a submissible case to the jury. In its second point, LMI contends the trial court erred in denying its motion for directed verdict at the close of all the evidence as to Doe Run's claims for vexatious refusal to pay under Section 375.420.[4]

Doe Run raises six points on cross-appeal. In its first point, Doe Run contends the trial court erroneously found that New York law governed the interpretation and application of the insurance policies. In its second point, Doe Run argues the trial court erroneously ruled that New York's pro rata allocation scheme applied to its damages. In its third point, Doe Run alleges the trial court erroneously ruled on

summary judgment that its damages should be allocated over the entire period of contamination. In its fourth point, Doe Run argues the trial court erroneously ruled on summary judgment that there was no coverage under the policies for three sites. In its fifth point, Doe Run contends the trial court erred in clarifying its summary judgment ruling at the jury instruction conference after the close of all the evidence to find as a matter of law that there was no more than one occurrence per site. In its final point on appeal, Doe Run contends the trial court erred in denying its motion for prejudgment interest as its damages were liquidated or readily ascertainable.

## II. DISCUSSION

### LMI'S APPEAL

#### A. Coverage under the Policies

LMI alleges the trial court erred in denying its motion for directed verdict at the close of evidence because Doe Run failed to make a submissible case to the jury. LMI contends Doe Run failed to present substantial evidence that its damages were unexpected as required under the terms of the insurance policies. We disagree.

**4.** All statutory references are to RSMo. (2011), unless otherwise indicated.

■ Whether the plaintiff made a submissible case is a question of law we review *de novo. D.R. Sherry Const., Ltd. v. Am. Family Mut. Ins. Co.*, 316 S.W.3d 899, 904 (Mo. banc 2010). A case may not be submitted to the jury unless each and every fact essential to liability is predicated upon legal and substantial evidence. *Investors Title Co. v. Hammonds*, 217 S.W.3d 288, 299 (Mo. banc 2007). We review the evidence in the light most favorable to the plaintiff to determine whether a submissible case was made. *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 13 (Mo. banc 1994). The plaintiff may prove essential facts by circumstantial evidence as long as the facts proved and the conclusions to be drawn are of such a nature and are so related to each other that the conclusions may be fairly inferred. *Morrison v. St. Luke's Health Corp.*, 929 S.W.2d 898, 900 (Mo.App. E.D.1996). In order to reverse a jury's verdict for insufficient evidence, there must be "a complete absence of probative fact to support the jury's conclusion." *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 14 (Mo. banc 2012).

■ LMI strategically frames its argument to assert that the damages at issue consist of injury to property caused by waste migrating from Doe Run's milling sites. The EPA orders, however, were primarily concerned with hazardous substances and concentrations of harmful lead being released that caused environmental damage, not merely the migration of minerals as LMI contends.[5] LMI's contention that Doe Run presented *no evidence* that it did not anticipate and expect the environmental remediation damages is without merit. To the contrary, Doe Run presented substantial evidence at trial that it was unaware that chat piles and tailings ponds were toxic and caused environmental harm. Dr. Richard Bullock, who worked for Doe Run in the 1950s, testified that Doe Run did not test for lead concentration in the mines because the form of lead being mined, galena, was not poisonous. He also testified that dust blowing from the tailings ponds and chat piles was not considered a toxic issue in the 1950s. Many people, including Doe Run employees and managers, lived near the chat piles without concern of the piles or ponds being toxic. Employees and managers allowed their children to play on the chat piles.

Not even the State of Missouri believed the chat piles or tailings ponds were harmful. In 1969, Doe Run donated 280 tons of chat to St. Francois County, 900 tons to Desloge, and 780 tons to a Boy Scout range. Doe Run also donated one of its sites to the State. The State turned the site into a park and allowed people to drive off-road vehicles on the tailings ponds and recreationally use a beach made of tailings. Further, the Missouri Department of Transportation issued a report finding that lead mine chat was not hazardous and could be used to de-ice roads.

■ A directed verdict is a drastic action to be taken sparingly and only where reasonable persons in an honest and impartial exercise of their duty could not differ on a correct disposition of the case. *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 783 (Mo. banc 1999). The trial court properly denied LMI's motion for a directed verdict as reasonable minds could differ on the correct disposition of this case. LMI's contention that Doe Run presented *no evidence* that the damages

---

5. Louis Marucheau, Doe Run's vice president, testified that Doe Run knew minerals were migrating off property "creating more like a nuisance," but Doe Run was unaware that the minerals caused environmental damage.

were unexpected is not supported by the record. Point denied.

## B. Vexatious Refusal to Pay Claim

LMI contends the trial court erred in denying its motion for directed verdict at the close of all the evidence as to Doe Run's claims for unreasonable failure to pay under Section 375.420. LMI alleges Doe Run presented no substantial evidence that LMI lacked reasonable cause to believe it had meritorious defenses to Doe Run's claims. LMI claims Doe Run offered no evidence that justified a finding that its handling of Doe Run's claims was vexatious and recalcitrant. We disagree.

Whether the plaintiff made a submissible case is a question of law we review *de novo*. *D.R. Sherry Const., Ltd.*, 316 S.W.3d at 904. A case may not be submitted to the jury "unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Hammonds*, 217 S.W.3d at 299 (Mo. banc 2007). We review the evidence in the light most favorable to the plaintiff to determine whether a submissible case was made. *Tune*, 883 S.W.2d at 13. "The plaintiff may prove essential facts by circumstantial evidence as long as the facts proved and the conclusions to be drawn are of such a nature and are so related to each other that the conclusions may be fairly inferred." *Morrison*, 929 S.W.2d at 900.

In order to prevail on a claim for vexatious refusal pursuant to Section 375.420, "the insured must show that the insurance company's refusal to pay the loss was willful and without reasonable cause or excuse, as the facts would have appeared to a reasonable person before trial." *Watters v. Travel Guard Int'l*, 136 S.W.3d 100, 108 (Mo.App. E.D.2004). Insurers are not made liable for vexatious refusal merely by insisting upon a judicial determination of open questions of law or fact. *Id.* at 109. There may be no vexatious refusal where the insurer has reasonable cause to believe and does believe there is no liability under its policy and it has a meritorious defense. *Wood v. Safeco Ins. Co. of America*, 980 S.W.2d 43, 55 (Mo.App. E.D.1998).

Whether LMI acted reasonably is an inherently factual inquiry left to the province of the jury. As a general rule, questions of reasonableness are questions of fact, not law. *Wunsch v. Sun Life Assurance Co. of Can.*, 92 S.W.3d 146, 153 (Mo.App. W.D.2002). A resolution otherwise "is never appropriate where the underlying facts remain in dispute or where fair-minded people, exercising reasonable judgment, could reach different conclusions on the issue in controversy." *Shirkey v. Guar. Trust & Life Ins. Co.*, 258 S.W.3d 885, 889 (Mo.App. W.D.2008) (internal quotations omitted).

LMI's contention that Doe Run presented *no evidence* to show that its actions were vexatious and recalcitrant is without merit. To the contrary, Doe Run presented substantial evidence from which the jury was free to find vexatious and recalcitrant behavior. Doe Run made a formal request for coverage on December 11, 2006. LMI did not acknowledge the request until March 8, 2007, after Doe Run initiated litigation. LMI's corporate designee, Gary Bartless, testified that LMI never paid a single environmental claim unless ordered to do so by a court or as part of a negotiated settlement. From this testimony, the jury was free to infer that LMI had no intention to pay the claim unless ordered to do so by the court. As such, a reasonable juror could find that the refusal to pay was willful and recalcitrant.

To show that LMI never conducted a diligent investigation of its claims, Doe Run elicited testimony from LMI's claims handler Peter Dinunzio. Dinunzio testi-

fied that LMI's claim file could fit in a third to a half of a banker's box and consisted of the policies and some of the pleadings in the case. Dinunzio also testified that even after four years of litigation, LMI could not make a coverage determination. Despite having claims files open regarding the Leadwood site for more than ten years, and despite conducting discovery on Doe Run in two prior coverage litigations in 2007, LMI claimed it knew virtually nothing about Doe Run's Leadwood site claim. Although LMI reviewed six million pages of documents it requested and obtained from Doe Run, it claimed to lack sufficient evidence on which it could affirm or deny coverage. The jury apparently believed the refusal to pay the claim or make a determination of coverage was unreasonable. We defer to the jury's findings of facts and credibility determinations. *Wilkes v. Group Underwriters Mut.*, 715 S.W.2d 308, 310 (Mo.App. E.D. 1986).

■ LMI contends that its denial of coverage was based on a reasonably litigable issue of law or fact. Even if LMI did have a reasonable basis to deny coverage, which we do not find, that would not necessarily preclude a penalty for vexatious delay if there was evidence that the insurer's attitude was vexatious and recalcitrant. *Watters*, 136 S.W.3d at 109. We find there was substantial evidence for the jury to find LMI acted recalcitrantly and vexatiously in its handling of Doe Run's claim. Point denied.

## DOE RUN'S CROSS–APPEAL

### A. Choice of Law

Doe Run contends that the trial court erroneously found that New York governed the interpretation and application of the insurance policies. Because Missouri is the principal place of the insured risk pursuant to Section 193 of the Restate-

ment (Second) of Conflict of Laws, we agree.

■ We review a trial court's ruling determining which state's law applies to an insurance policy *de novo*. *Viacom, Inc. v. Transit Cas. Co.*, 138 S.W.3d 723, 724–25 (Mo. banc 2004). Missouri has adopted Sections 188 and 193 of the Restatement (Second) of Conflict of Laws (1971) for the purpose of determining which state's law governs the interpretation of insurance contracts absent a choice of law provision. *Id.* Pursuant to Section 188, the law of the state with the most significant relationship to the parties governs. Restatement (Second) of Conflict of Laws Section 188(1)(1971). The contacts to be taken into account when identifying the most significant relationship include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Section 188(2).

■ Section 193, in pertinent part, states that the "validity of . . . [the] insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy. . . ." Under comment b of Section 193, "the location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state." A risk's principal location enjoys the greatest significance when an immovable object is involved, such as when the risk insured against is damaged by fire to a particular building. Section 193 cmt. b. "In an action between the parties to an insurance con-

tract, the principal location of the insured risk is the most important contact to be considered in determining the applicable law." *Atlas Intermodal Trucking Serv. v. United Fire & Cas. Co.* 973 S.W.2d 174, 178 (Mo.App. E.D.1998).

We find Missouri is the principal location of the insured risk under the insurance policies.[6] The risks at issue in the underlying lawsuit concern parties, operations, and sites located in Missouri. Each site of the six sites is located in Missouri. Doe Run is headquartered in Missouri, with nearly all of its business, property, and employees in Missouri. On the face of each of the insurance policies, LMI denominates the insured as "St. Joseph Lead Company of Bonne Terre, Missouri." *See Hartzler v. Am. Family Mut. Ins. Co.*, 881 S.W.2d 653, 657 (Mo.App. W.D.1994)(finding Kansas law applied when the insurance policies were designated "Kansas Family Car Policy" and contained various preprinted provisions unique to Kansas statutory requirements). From 1864 through the coverage period, the vast majority of Doe Run's mining operations were located in Missouri. As Doe Run notes, when LMI began issuing policies to Doe Run in 1952, the company operated far more mining, milling, and smelting operations in Missouri and employed far more people in Missouri than it did in all other states combined, including New York.

LMI's argument that the location of the risk is not entitled to greater weight than the other Section 188 contacts because the policies cover occurrences that happen during the policy period "anywhere in the world . . . ." is tenuous, at best. Although LMI emphasizes Doe Run's national business and risks, these policies related over-whelmingly to business operations and risks in Missouri. Doe Run's business operations in other states do not require this court to find that the parties did not consider Missouri to be the principal location of the insured risk. LMI relies on *Viacom Inc. v. Transit Cas. Co.*, 138 S.W.3d 723 (Mo. banc 2004) for its proposition that the location of the insured risk is entitled to less weight when the policy covers a group of risks scattered throughout two or more states. In *Viacom*, an insurance coverage case involving asbestos claims arising from products sold in numerous states, the Missouri Supreme Court applied the factors enumerated in Section 188. *Viacom*, 138 S.W.3d at 725. The Court found that parties could expect that the insured risk was predominantly located in Pennsylvania. *Id.* (finding appellant was incorporated in Pennsylvania, where its insurance department was based. Many policies were contracted for and negotiated in Pennsylvania and issued through Pennsylvania brokers. The policies were delivered to appellant in Pennsylvania and paid for there.).

The insured risk in the present case, however, was predominately located in Missouri. Even the trial court found that Missouri is the principal location of the insured risk, although it applied New York law. Unlike *Viacom*, where the Court found that the *only* connection with Missouri was the party's location, here, the vast majority of Doe Run's mining operations, along with each of the six sites at issue, are located in Missouri. The evidence does not support an assertion that the parties expected the principal location of the insured risk to be located in New York, or any state other than Missouri.

---

**6.** Because Missouri is the principal place of the insured risk, we do not analyze the factors enumerated in Section 188. Section 193 is the applicable rule unless another state has a more significant relationship to the parties than does the "principal location" state. *Hartzler v. Am. Family Mut. Ins. Co.*, 881 S.W.2d 653, 656 (Mo.App. W.D.1994).

Applying the law of the state in which the insured risk is located rather than that in which the contract was made is further warranted when there exists a possibility the court would have to apply the law of numerous states in interpreting over 20 contracts which insure the identical risk. Damages occurred and the claims were filed in the forum state of Missouri.

*Crown Ctr. Redev. Corp. v. Occidental Fire Cas. Co.*, 716 S.W.2d 348, 359 (Mo. App. W.D.1986). We find, pursuant to Section 193, Missouri is the principal location of the insured risk, and the trial court erred in applying New York law. We reverse the trial court's decision. Point granted.[7]

### B. Allocation Scheme Under the Policy

Doe Run contends that the trial court erroneously ruled that New York's pro rata allocation scheme applied to its damages. Under the pro rata approach, damages are spread proportionately across the entire period during which the property damage takes place. We find the express language of the applicable insurance policies requires the adoption of the all sums allocation scheme in this case.[8]

■■■■■ In interpreting an insurance contract, we must keep in mind that insurance policies are contracts; thus, the rules of contract construction apply. *Am. Family Mut. Ins. Co. v. St. Clair*, 295 S.W.3d 586, 591 (Mo.App. E.D.2008). The words of a policy must be given their plain and ordinary meaning consistent with the reasonable expectation and objectives of the parties, unless it is obvious that a technical meaning was intended. *Standard Artificial Limb, Inc. v. Allianz Ins. Co.*, 895 S.W.2d 205, 209 (Mo.App. E.D.1995); *Krombach v. Mayflower Ins. Co. Ltd.*, 785 S.W.2d 728, 731 (Mo.App. E.D.1990). We read insurance policies as a whole to determine the parties' intent, and give effect to this intent by enforcing the contract as written. *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 556 (Mo.App. W.D.2008). We must endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant. *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo.App. W.D.2000). The mere fact that the parties disagree over the interpretation of the terms of a contract does not create an ambiguity. *Stotts v. Progressive Classic Ins. Co.*, 118 S.W.3d 655, 662 (Mo. App. W.D.2003)

■■■■ The plain language of the applicable insurance policies requires the adoption of the all sums allocation scheme in this case. Under the 1952–1955 and 1955–1958 policies, LMI agreed to indemnify Doe Run for the ultimate net loss. The policies define "ultimate net loss" as the "*total sum* which the assured, or any company as his insurer, becomes obligated to pay by reason of personal injury or property damage claims . . . as a consequence of any occurrence covered hereunder. . . ."

---

7. Because we find that Missouri law applies to the interpretation and application of the policies, we need not address two of Doe Run's points on appeal as the trial court's rulings were based on New York law. We will not address Doe Run's allegation that the trial court erred in ruling on summary judgment that its damages be allocated over the entire period of contamination. We will also not address Doe Run's allegation that the trial court erred in ruling on summary judgment that there was no coverage under the 1958–1961 policies for the Big River/Desloge, Elvins, and National sites.

8. We do not reach the issue of whether Missouri law requires an all sums approach or a pro rata approach as the plain language of the policies governs here.

The 1958–1961 policies state, in pertinent part:

> Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter sanctioned, to indemnify the insured for *all sums* which the Assured shall be obliged to pay by reason of the liability ... for damages ... on account of property damage, caused by or arising out of each occurrence happening during the policy period." (emphasis added).

■■■ The policies define occurrence as "one happening or series of happenings, arising out of, or due to one event taking place during the term of this policy." This definition does not limit the policies' promise to pay all sums of the policy holder's liability solely to damage during the policy period. We must construe the policy as written and cannot rewrite the policy for the parties. *Pakmark Corp. v. Liberty Mut. Ins. Co.*, 943 S.W.2d 256, 259 (Mo. App. E.D.1997). We find the express language of the applicable insurance policies requires the adoption of the all sums allocation scheme in this case. We reverse the trial court's decision to allocate the damages pro rata. Point granted.

### C. Occurrences Per Site

■■■ Doe Run contends that the trial court erred in clarifying its summary judgment ruling at the jury instruction conference after the close of all the evidence to find as a matter of law that there was no more than one occurrence per site. Originally, the trial court had not made such a ruling. Throughout the trial, the court allowed Doe Run to present evidence of multiple occurrences at each site. The result of the subsequent ruling reduced the policy limits available to Doe Run and drastically lowered the total amount of coverage available. Doe Run asserts that the undisputed evidence at trial proved that each chat pile, tailings pond, and ac-

tive operation was a separate cause of alleged contamination constituting separate occurrences under the policies as a matter of law. We agree.

Our review of summary judgment is essentially *de novo.* *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We review the record in the light most favorable to the non-moving party, and that party is accorded all reasonable inferences that may be drawn from the record. *Id.* Facts set forth in support of defendants' motion for summary judgment are taken as true unless contradicted by plaintiff's response. *Id.* We will uphold the grant of summary judgment on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* at 377.

Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 377. The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate the existence of a genuine issue for trial. *Id.*

Under the 1952–1955 and 1955–1958 policies, "occurrence" is defined as:

> an expected event or happening which results in personal injury or damage to property during the policy period or a continuous or repeated exposure to conditions which result in personal injury or damage to property during the policy period, provided the assured did not intend or anticipate the injury or damage would result. (All damages arising out of such exposure to the same general

conditions shall be considered as arising out of one occurrence.)

The 1958–1961 polices define occurrence as "one happening or series of happenings, arising out of, or due to one event taking place during the term of this policy."

LMI argues that the resulting property damage at each site resulted from exposure to the same general conditions—the continual migration of waste—whether the source of the waste migrating from a given site was Doe Run's active mining and milling operations, chat piles, or tailings ponds. It follows, LMI contends, that the policies treat all such damages from a given site as arising out of one occurrence.

The active contamination, tailings ponds, and chat piles, however, constitute separate and distinct causes of contamination that resulted in separate occurrences at each of the six sites at issue. When determining the number of occurrences, Missouri typically applies a "cause" approach which examines the cause or causes of the accident or occurrence to determine whether there is a single or multiple occurrence. *See Kansas Fire & Cas. Co. v. Koelling*, 729 S.W.2d 251 (Mo.App. E.D. 1987). The chat piles and tailings ponds were physically distinct with different migration profiles to constitute separate causes of contamination. Chat piles generally towered several hundred feet high before remediation, and contained higher concentrations of lead toxicities than the tailings ponds. Tailings ponds could cover thousands of acres and filled topographical depressions. The chat piles and tailings ponds were located at different areas around the mills and, in some instances, miles apart. The EPA even recognized that chat piles, tailings ponds, and active operations were separate causes of damage to the environment and required different remediation techniques for each.

Under its summary judgment rulings, the trial court found that active operations constituted an occurrence under the policies because the EPA alleged such operations resulted in active pollution. The court also found that passive migration constituted an occurrence because passive migration is a "continuous and repeated exposure" under the 1952–1955 and 1955–1958 policies. We hold that under the cause approach, there were three occurrences at each site in active operation during the policy period—active operations, chat piles, and tailings ponds—and two occurrences at inoperative sites—chat piles and tailings ponds. We reverse the trial court's judgment and remand with instructions to reinstate the full amount of the jury verdict. Point granted.

## D. Prejudgment Interest

Doe Run contends the trial court erred in denying its motion for prejudgment interest as its damages were liquidated or readily ascertainable. We agree.

 Whether a party is entitled to prejudgment interest is governed by Section 408.020. Interpretation and application of a statute to the facts is a question of law that we review *de novo*, giving no deference to the trial court's ruling. *Comens v. SSM St. Charles Clinic Med. Group, Inc.*, 335 S.W.3d 76, 80 (Mo.App. E.D.2011). Section 408.020, in pertinent part, states:

> Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts . . . after they become due and demand of payment is made. . . .

Parties may also agree on a specific rate of interest which will control if it is not otherwise excessive under the law. *Schnucks Carrollton Corp. v. Bridgeton Health and*

*Fitness Inc.,* 884 S.W.2d 733, 740 (Mo.App. E.D.1994). If no other rate of interest is agreed upon, the rate in Section 408.020 is applicable. *Id.* Prejudgment interest may only be awarded where the claim is liquidated. *Miller v. Gammon & Sons, Inc.,* 67 S.W.3d 613, 624 (Mo.App. W.D.2001). To be liquidated, the claim must be fixed and determined or readily ascertainable by computation or a recognized standard. *Id.* The award of prejudgment interest in a case in which damages are liquidated is not a matter of court discretion; it is compelled. *Comens,* 335 S.W.3d at 82; *Holtmeier v. Dayani,* 862 S.W.2d 391, 407 (Mo.App. E.D.1993). The purpose of statutory prejudgment interest is to promote settlement of lawsuits and fully compensate plaintiffs by accounting for the time-value of money. *Comens,* 335 S.W.3d at 80. In an action for breach of a written contract, interest ordinarily runs from the date of the breach or the time when payment was due under the contract. *Miller,* 67 S.W.3d at 624–25.

▮▮▮▮ Doe Run is entitled to prejudgment interest as its damages were readily determinable and ascertainable by computation. LMI's contention that Doe Run failed to make a demand for payment definite as to time and amount is belied by the facts. Doe Run's damages were the costs it incurred in responding to the EPA remediation orders. At trial, Doe Run presented evidence that it sent LMI purchase orders, invoices, and pay stubs that reflected the costs incurred. This is unlike *Nangle v. Brockman,* 972 S.W.2d 545, 550 (Mo.App. E.D.1998), the case on which LMI relies, where respondent did not request payment nor send a bill for the work he performed. Doe Run also provided LMI spreadsheets that detailed all of the individual remediation invoices and costs. Further, "exact calculation is not necessary for a claim to be liquidated." *Weinberg v. Safeco Ins. Co. of Ill.,* 913 S.W.2d

59, 62 (Mo.App. E.D.1995). The fact that LMI presented several coverage defenses and disputed some of the costs is of no consequence. Missouri courts have allowed prejudgment interest for insurance claims where the parties did not agree to the amount due under the policy. *Watters,* 136 S.W.3d at 111–12.

LMI's argument that Doe Run seeks damages that have not been incurred is erroneous. Doe Run seeks prejudgment interest from the date the lawsuit was filed. Because the EPA required Doe Run to continue its remediation efforts even while the lawsuit was pending, Doe Run also seeks interest from the date those costs were submitted to LMI. Doe Run made multiple additional demands for payments as additional costs were incurred. LMI argues that Doe Run never made a demand for payment before trial. Even if Doe Run did not demand payment before it filed the lawsuit, which we do not find, "the filing itself constitutes a demand." *Watters,* 136 S.W.3d at 111.

Because Doe Run's damages were ascertainable by computing the invoices and spreadsheets that detailed remediation costs, damages were liquidated, and prejudgment interested is compelled pursuant to Section 408.020. Point granted.

### III. CONCLUSION

Because Missouri law applies, the judgment is affirmed in part, and reversed and remanded with instructions to reinstate the jury verdict.